POMERANTZ LLP
Jeremy A. Lieberman (admitted *pro hac vice*)
Brenda Szydlo (admitted *pro hac vice*)
Thomas H. Przybylowski
Dean P. Ferrogari (admitted *pro hac vice*)
600 Third Avenue, 20th Floor
New York, New York 10016
Telephone: (212) 661-1100
Facsimile: (917) 463-1044
jalieberman@pomlaw.com
bszydlo@pomlaw.com
tprzybylowski@pomlaw.com
dferrogari@pomlaw.com

[*Additional counsel on signature page*]

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| IN RE BIOLINERX LTD. SECURITIES LITIGATION | Case No. 2:23-cv-00041-BRM-JBC |
| | <u>CLASS ACTION</u> |
| THIS DOCUMENT RELATES TO: | AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS |
| Case No. 2:23-cv-00041-BRM-JBC Peter Catanese | JURY TRIAL DEMANDED |

Lead Plaintiff Peter Catanese and Plaintiff Michael Morlock (collectively, "Plaintiffs"), individually and on behalf of all other persons similarly situated, by Plaintiffs' undersigned attorneys, for Plaintiffs' amended complaint against Defendants, alleges the following based upon personal knowledge as to Plaintiffs

and Plaintiffs' own acts, and upon information and belief as to all other matters, based upon the investigation conducted by and through Plaintiffs' attorneys, which included, *inter alia*, a review of Defendants' public documents, conference calls and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding BioLineRx Ltd. ("BioLineRx" or the "Company"), analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiffs believe that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.     This is a federal securities class action on behalf of a class consisting of all persons other than Defendants who purchased or otherwise acquired BioLineRx Ltd. American Depositary Shares ("ADSs") between February 23, 2021 and September 19, 2022, both dates inclusive (the "Class Period"), seeking to recover damages caused by Defendants' violations of the federal securities laws and to pursue remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder, against the Company, and its Chief Executive and Chief Financial Officers.

2.      BioLineRx is a pre-commercial-stage biopharmaceutical company focused on oncology.  During the Class Period, the Company touted a promising pipeline.

3.      The Company's lead program, Motixafortide, is a cancer therapy platform.  Motixafortide works by blocking the interaction between CXCL12 and CXCR4 to mobilize hematopoietic stem cells into the peripheral blood for collection and transplant.

4.      Motixafortide was evaluated in the Company's GENESIS trial, which was a Phase 3 study in stem cell mobilization for autologous bone-marrow transplantation for patients suffering from multiple myeloma, an incurable blood cancer.

5.      In May 2021, the Company announced that the GENESIS study achieved all of its primary and secondary endpoints with a high degree of statistical significance, and appeared to be a huge success.

6.      Motixafortide is also being evaluated in studies for the treatment of pancreatic cancer.

7.      The Company is also developing another oncology program, AGI–134, an immunotherapy treatment for multiple solid tumors that is being investigated.

8.      Throughout the Class Period, Defendants misled the market to believe that the Company had sufficient funds through the first half of 2024 to achieve

various milestones, including potential FDA approval and the commercial U.S. launch of Motixafortide in stem cell mobilization, while at the same time advancing other pipeline programs.

9.     Defendants' misrepresentations and/or omissions artificially inflated the price of the Company's ADS.  With a $75 million market cap as of August 25, 2022, $43.2 million cash as of June 30, 2022, and a cash runway until the first half of 2024, the Company appeared to be in sound financial condition.

10.    Yet, by mid-September 2022, the Company disclosed the truth. BioLineRx would require a loan from Kreos Capital VII Aggregator SCSP ("Kreos Capital") in an aggregate principal amount of up to $40 million and a $15 million direct securities offering in which the Company agreed to sell its ADSs to certain institutional investors *at a steep discount of almost 30%* to raise $15 million *to facilitate the commercial launch of Motixafortide in stem cell mobilization and for general corporate purposes*.

11.    On this news, the price of BioLineRx's ADS fell $0.52, or *approximately 34%*, to close at $1.02 per ADS on September 19, 2022, damaging investors.

## JURISDICTION AND VENUE

12.    The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act, (15 U.S.C. §§78j(b) and 78t(a)), and Rule 10b-5 promulgated thereunder (17 C.F.R. §240.10b-5).

13.    This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331, and § 27 of the Exchange Act (15 U.S.C. §78aa).

14.    Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act (15 U.S.C. § 78aa(c)) as the alleged misstatements entered and the subsequent damages took place in this judicial district.

15.    In connection with the acts, conduct and other wrongs alleged in this Amended Complaint, Defendants (defined below), directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mails, interstate telephone communications and the facilities of the national securities exchange.

## PARTIES

16.    Lead Plaintiff Peter Catanese, as set forth in his previously filed certification incorporated by reference herein, purchased BioLineRx ADSs at artificially inflated priced during the Class Period and was damaged as a result. *See* ECF No. 7-3.

17.    Plaintiff Michael Morlock, as set forth in the attached Certification, purchased BioLineRx ADSs at artificially inflated prices during the Class Period and was damaged as a result.

18.    Defendant BioLineRx is a pre-commercial stage biopharmaceutical company focused on oncology, headquartered at 2 Hama'ayan St, Modi'in, Central District, 7177871, Israel. BioLineRx ADSs are listed on NASDAQ under ticker symbol BLRX.

19.    Defendant Philip A. Serlin ("Serlin") is and was at all pertinent times the Company's Chief Executive Officer ("CEO").  Prior to becoming the CEO in October 2016, Defendant Serlin served as the Company's Chief Financial and Operating Officer beginning in 2009.

20.    Defendant Mali Zeevi ("Zeevi"), is and was at all pertinent times the Company's Chief Financial Officer ("CFO").  Ms. Zeevi has served as the Company's CFO since October 2016.  Prior to becoming CFO, Ms. Zeevi served as the Company's Senior Director of Finance and Reporting beginning in 2011 and the Company's Director of Finance and Reporting beginning in 2009.

21.    Defendants Serlin and Zeevi are sometimes referred to as the "Individual Defendants."

22.    The Individual Defendants possessed the power and authority to control the contents of BioLineRx's SEC filings, press releases, and other market

communications. The Individual Defendants were provided with copies of the Company's SEC filings and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions with the Company, and their access to material information available to them but not to the public, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public, and that the positive representations being made were then materially false and misleading. The Individual Defendants are liable for the false statements and omissions pleaded herein.

23. The Company is liable for the acts of the Individual Defendants and the Company's other employees under the doctrine of *respondeat superior* and common law principles of agency because all of the wrongful acts complained of herein were carried out within the scope of their employment.

24. The scienter of the Individual Defendants and other employees and agents of the Company is similarly imputed to the Company under *respondeat superior* and agency principles.

25. The Company and the Individual Defendants are referred to herein, collectively, as "Defendants."

7

## SUBSTANTIVE ALLEGATIONS

**I.    Background**

26.    BioLineRx is a pre-commercial-stage biopharmaceutical company focused on oncology.  The Company had a promising pipeline during the Class Period.

27.    The Company's lead program, Motixafortide (BL-8040), is a cancer therapy platform.  Motixafortide works by blocking the interaction between CXCL12 and CXCR4 to mobilize hematopoietic stem cells into the peripheral blood for collection and transplant.

28.    Motixafortide was evaluated in the Company's GENESIS trial, which was a Phase 3 study in stem cell mobilization ("SCM") for autologous bone-marrow transplantation.

29.    The GENESIS trial (NCT03246529), initiated in December 2017, was a randomized, placebo-controlled, multicenter study, evaluating the safety, tolerability and efficacy of Motixafortide and granulocyte colony-stimulating factor ("G-CSF"), compared to placebo and G-CSF, for the mobilization of hematopoietic stem-cells for autologous transplantation in multiple myeloma patients.

30.    Multiple myeloma is an incurable blood cancer that affects some white blood cells called plasma cells, which are found in bone marrow.  When damaged, these plasma cells spread and replace normal cells in the bone marrow with tumors.

31.    Autologous stem cell transplantation is part of the standard treatment paradigm for a number of blood cancers, including multiple myeloma.

32.    In May 2021, the Company announced that the GENESIS study achieved all of its primary and secondary endpoints with a high degree of statistical significance (p<0.0001).  The combination of Motixafortide and G-CSF was also found to be safe and well tolerated.

33.    According to Defendant Serlin, "our GENESIS Phase 3 study showed that nearly 90 percent of patients collected an optimal number of [stem] cells for transplantation following a single administration of [Motixafortide] and in only one apheresis session."

34.    With such positive data, the Company, on September 12, 2022 – just seven days before the end of the Class Period – announced that it submitted its New Drug Application ("NDA") to the U.S. Food and Drug Administration ("FDA") for APHEXDA (Motixafortide) in SCM for autologous bone marrow transplantation for multiple myeloma patients.  The drug has yet to be approved.

35.    Motixafortide was also evaluated in a Phase 2a study for the treatment of pancreatic cancer ("PDAC") in combination with KEYTRUDA and chemotherapy, and is being studied in combination with LIBTAYO and chemotherapy as a first-line PDAC therapy.  A randomized phase 2b study with 200

patients in combination with PD1 and chemotherapy as a first-line PDAC therapy will initiate in 2023.

36.    In addition, the Company is also developing a second oncology program, AGI–134, an immunotherapy treatment for multiple solid tumors that is being investigated in a Phase 1/2a study.

## II.    Defendants Misled the Market to Believe the Company Had Sufficient Funds through the First Half of 2024 to Achieve Various Milestones, Including Potential FDA Approval and the Commercial U.S. Launch of Motixafortide in 2023, While at the Same Time Advancing Other Pipeline Programs

37.    Throughout the Class Period, Defendants repeatedly touted that it had sufficient funds for years to come to achieve various milestones, *including potential FDA approval and the commercial U.S. launch of Motixafortide in 2023*, while at the same time advancing other pipeline programs.

38.    At the beginning of the Class Period (mid-February 2021), Defendants told investors that the Company had sufficient funds to meet its capital requirements into the second half of 2023.  Thereafter, beginning in May 2021, Defendants told the market that the Company had enough funds to execute its strategy and achieve various milestones into the first half of 2024.  For example, the Company's August 18, 2021 press release states: ***"We are very well financed with $66 million of cash, sufficient to bring Motixafortide through potential FDA approval in SCM while continuing to advance our other clinical programs."*** And Note 1 to the Company's

Condensed Consolidated Interim Financial Statements (Unaudited) as of June 30, 2021, filed with the SEC on August 18, 2021, states: ***"Management believes that the Company's current cash and other resources will be sufficient to fund its projected cash requirements into the first half of 2024."***

39.    In fact, until as late as September 1, 2022, the Company would repeatedly tout that it had sufficient funds, into the first half of 2024, to achieve various milestones, including potential FDA approval and the commercial U.S. launch of the Motixafortide in 2023, while at the same time advancing other pipeline programs.  Defendants' misrepresentations and/or omissions artificially inflated the price of the Company's ADS.  With a $75 million market cap as of August 25, 2022, $43.2 million cash as of June 30, 2022, and a cash runway until the first half of 2024, the Company appeared to be in sound financial condition.

40.    Despite these assurances, by mid-September 2022, just a few weeks after representing that it had enough cash until the first half of 2024, BioLineRx would require a loan from Kreos Capital in an aggregate principal amount of up to $40 million *and* a $15 million direct securities offering in which the Company agreed to sell its ADSs to certain institutional investors *at a steep discount of almost 30%* to raise $15 million ***to facilitate the commercial launch of Motixafortide in SCM and for general corporate purposes***.

### III.    Philip Serlin, the Company's Chief Executive Officer, and Mali Zeevi, the Company's Financial Officer, Benefitted Financially from the Fraud

41.    According to the Company's March 2020 and May 2022 "Compensation Policy for Executives and Directors" filed with the SEC (the "Compensation Policy"), the Individual Defendants could receive "a special bonus" "on the occurrence of significant events, such as" "[c]ompleting a substantial funding event (*not less than $15 million*)." (Emphasis added.)   The Individual Defendants' special bonus was each capped at "up to 4 monthly salaries."

42.    Raising capital could also increase the Individual Defendants' annual bonus, which was a separate bonus in addition to the special bonus. According to the Compensation Policy, "success in raising capital" was considered a "measurable personal objective" and one of the "performance metrics" considered for purposes of an executive's annual bonus.  "Meeting measurable personal objectives," which includes "success in raising capital," was assigned a weight of "15% to 25%" for purposes of determining an executive's annual bonus.  Defendants Serlin and Zeevi's annual bonuses were capped at "8 monthly salaries" and "6 monthly salaries," respectively.

43.    In January 2021, prior to the Class Period, the Company raised capital by selling $14,375,000 ADSs in a public offering at $2.40 per ADS, resulting in gross proceeds of $34.5 million.

44.    As a result of this "substantial funding event" in January 2021, both Serlin and Zeevi became eligible for their maximum special bonuses of $96,666 and $62,000, respectively, *for the entire year*.  To receive additional special bonuses, Serlin and Zeevi both knew that another substantial funding event of not less than $15 million would need to be completed in 2022.  And that's exactly what happened.

45.    Throughout the Class Period, Defendants misled the market to believe the Company had sufficient cash until the first half of 2024 to execute its strategy for Motixafortide in SCM, while at the same time advancing other pipeline programs.  Defendants' misrepresentations and omissions, as late as September 1, 2022, artificially increased the price of the Company's ADS and helped to raise additional capital via the Company's debt and equity financing disclosed in mid-September 2022.  The $15 million direct securities offering, disclosed on September 19, 2022, enabled Serlin and Zeevi to receive special and annual bonuses of $238,000 and $122,000, respectively, in 2022, as more fully described herein.

## MATERIALLY FALSE AND MISLEADING STATEMENTS ISSUED DURING THE CLASS PERIOD

**February 23, 2021 Statements**

46.    The Class Period begins on February 23, 2021, when the Company filed a Form 6-K with the SEC, signed by Defendant Serlin, along with a press release, filed as Exhibit 1, announcing the Company's financial results for the year ended

December 31, 2020.  The February 23, 2021 press release states, in relevant part (emphasis added):

> "[S]ubsequent to the end of the year, we strengthened our balance sheet through a financing that resulted in gross proceeds of $34.5 million. ***These funds will allow us to continue to execute on our strategy for motixafortide in both SCM and PDAC, while in parallel advancing our second clinical candidate, the anti-cancer immunotherapy AGI-134, through clinical development***. In summary, we exited 2020 on a very positive note, with two data sets that demonstrate both the effectiveness and versatility of motixafortide across multiple indications, and we plan to build upon these successes this year," concluded Mr. Serlin.

47.     On February 23, 2021, the Company also filed a Form 20-F with the SEC, signed by Defendant Serlin.  The Form 20-F states, in relevant part (some emphasis added):

> ***We cannot assure investors that our existing cash and investment balances will be sufficient to meet our future capital requirements.***[1]
>
> As of December 31, 2020, we held cash and short-term investments of $22.6 million. In January 2021, we raised net proceeds of $31.4 million in an underwritten public offering and, in January and February 2021, we received another $9.8 million in gross proceeds from the exercise of outstanding warrants. ***Based on our current projected cash requirements, we believe that our existing cash and investment balances and other sources of liquidity, not including potential milestone and royalty payments under our existing out-licensing and other collaboration agreements, will be sufficient to meet our capital requirements into the second half of 2023.*** We have funded our operations primarily through public and private offerings of our securities, payments received under our strategic licensing and collaboration arrangements and interest earned on investments.

---

[1] Emphasis in original.

***

Developing drugs, conducting clinical trials and commercializing products is expensive and we will need to raise substantial additional funds to achieve our strategic objectives. Although *we believe our existing cash and other resources will be sufficient to fund our current projected cash requirements into the second half of 2023*, we will require additional financing in the future to fund our operations.

48.    The February 23, 2021 statements contained in ¶¶ 46-47 were false and/or misleading statements and/or failed to disclose that (i) the Company did not have enough funds to execute its strategy to develop Motixafortide in both SCM and PDAC, while at the same time advancing other pipeline programs, through the second half of 2023; and (ii) the Company would need significant additional funding by 2022 in order to fund its operations and pipeline programs.

**May 26, 2021 Statements**

49.    On May 26, 2021, BioLineRx filed a Form 6-K with the SEC, signed by Defendant Serlin, along with a press release, filed as Exhibit 1, announcing the Company's financial results for the first quarter of 2021.  The May 26, 2021 press release states, in relevant part (emphasis added):

We are working diligently to submit a New Drug Application [for Motixafortide in SCM] to the FDA in the first half of next year.  If approved, this would be transformative for BioLineRx, and a huge milestone in the Company's history.

***

*"To support these and other initiatives, including continued advancement of our second clinical candidate, the anti-cancer vaccine AGI-134, we raised $34.5 million in January that we believe*

15

***will finance the Company through multiple potentially value-creating milestones,"*** concluded Mr. Serlin.

50.     Exhibit 2 to the May 26, 2021 Form 6-K is the Company's Condensed Consolidated Interim Financial Statements (unaudited) as of March 31, 2021 (the "March 31, 2021 Unaudited Financial Statements").  Note 1 to the March 31, 2021 Unaudited Financial Statements states (emphasis added):

> Although the Company has succeeded in generating significant revenues from a number of out-licensing transactions in the past, it cannot determine with reasonable certainty if and when it will become profitable on a current basis. ***Management believes that the Company's current cash and other resources will be sufficient to fund its projected cash requirements into the first half of 2024.*** However, in the event that the Company does not begin to generate sustainable cash flows from its operating activities in the future, the Company will need to carry out significant cost reductions or raise additional funding.

51.     Exhibit 3 to the May 26, 2021 Form 6-K is the Company's "Operating and Financial Review[.]" It states, in relevant part (emphasis added):

> Developing drugs, conducting clinical trials and commercializing products is expensive and we will need to raise substantial additional funds to achieve our strategic objectives. Although ***we believe our existing cash and other resources will be sufficient to fund our current projected cash requirements into the first half of 2024***, we will require additional financing in the future to fund our operations.

52.     The May 26, 2021 statements contained in ¶¶ 49-51 were false and/or misleading statements and/or failed to disclose that (i) the Company did not have enough funds to execute its strategy to develop Motixafortide in SCM, while at the same time advancing other pipeline programs, through the first half of 2024; and

16

(ii) the Company would need significant additional funding by 2022 in order to fund its operations and pipeline programs.

**August 18, 2021 Statements**

53.    On August 18, 2021, BioLineRx filed a Form 6-K with the SEC, signed by Defendant Serlin, along with a press release, filed as Exhibit 1, announcing the Company's financial results for the quarter ended June 30, 2021.  The August 18, 2021 press release states, in relevant part (emphasis added):

> "Following the overwhelmingly positive results from our Phase 3 GENESIS trial of Motixafortide in stem-cell mobilization that we announced in May, we are working vigorously to submit an NDA in the first half of the year, stated Philip Serlin, Chief Executive Officer of BioLineRx. "If approved, this would be transformative for BioLineRx as we would have a commercial-stage molecule in multiple myeloma and significant potential clinical utility in other cancer indications as … most notably pancreatic cancer."
>
> ***
>
> ***"We are very well financed with $66 million of cash, sufficient to bring Motixafortide through potential FDA approval in SCM while continuing to advance our other clinical programs,"*** concluded Mr. Serlin.

54.    Exhibit 2 to the Company's August 18, 2021 Form 6-K is the Company's Condensed Consolidated Interim Financial Statements (Unaudited) as of June 30, 2021 (the "June 30, 2021 Unaudited Financial Statements").  Note 1 to the June 30, 2021 Unaudited Financial Statements states (emphasis added):

> Although the Company has succeeded in generating significant revenues from a number of out-licensing transactions in the past, it

cannot determine with reasonable certainty if and when it will become profitable on a current basis. ***Management believes that the Company's current cash and other resources will be sufficient to fund its projected cash requirements into the first half of 2024.*** However, in the event that the Company does not begin to generate sustainable cash flows from its operating activities in the future, the Company will need to carry out significant cost reductions or raise additional funding.

55.     Exhibit 3 to the August 18, 2021 Form 6-K is the Company's "Operating and Financial Review[.]" It states, in relevant part (emphasis added):

Developing drugs, conducting clinical trials and commercializing products is expensive and we will need to raise substantial additional funds to achieve our strategic objectives. Although ***we believe our existing cash and other resources will be sufficient to fund our current projected cash requirements into the first half of 2024***, we will require additional financing in the future to fund our operations.

56.     The August 18, 2021 statements contained in ¶¶ 53-55 were false and/or misleading statements and/or failed to disclose that (i) the Company did not have enough funds to execute its strategy to develop Motixafortide in SCM, while at the same time advancing other pipeline programs, through the first half of 2024; and (ii) the Company would need significant additional funding by 2022 in order to fund its operations and pipeline programs.

**November 18, 2021 Statements**

57.     On November 18, 2021, BioLineRx filed a Form 6-K with the SEC, signed by Defendant Serlin, along with the Company's Condensed Consolidated Interim Financial Statements (unaudited) as of September 30, 2021 (the "September

30, 2021 Unaudited Financial Statements"), filed as Exhibit 2.  Note 1 to the

September 30, 2021 Unaudited Financial Statements states (emphasis added):

> Although the Company has succeeded in generating significant revenues from a number of out-licensing transactions in the past, it cannot determine with reasonable certainty if and when it will become profitable on a current basis. ***Management believes that the Company's current cash and other resources will be sufficient to fund its projected cash requirements into the first half of 2024.*** However, in the event that the Company does not begin to generate sustainable cash flows from its operating activities in the future, the Company will need to carry out significant cost reductions or raise additional funding.

58.    Exhibit 3 to the November 18, 2021 Form 6-K, is the Company's

"Operating and Financial Review" that states (emphasis added):

> Developing drugs, conducting clinical trials and commercializing products is expensive and we will need to raise substantial additional funds to achieve our strategic objectives. Although ***we believe our existing cash and other resources will be sufficient to fund our current projected cash requirements into the first half of 2024***, we will require additional financing in the future to fund our operations.

59.    The November 18, 2021 statements contained in ¶¶ 57-58 were false

and/or misleading statements and/or failed to disclose that (i) the Company did not

have enough funds to execute its strategy to develop Motixafortide in SCM, while

at the same time advancing other pipeline programs, through the first half of 2024;

and (ii) the Company would need significant additional funding by 2022 in order to

fund its operations and pipeline programs.

**March 16, 2022 Statements**

60.    The Company's Form 20-F for the fiscal year ended December 31, 2021, filed with the SEC on March 16, 2022, states (emphasis added):

> As of December 31, 2021, we held cash and short-term investments of $57.1 million. ***Based on our current projected cash requirements, we believe that our existing cash and investment balances and other sources of liquidity, not including potential milestone and royalty payments under potential out-licensing and other collaboration agreements, will be sufficient to meet our capital requirements into the first half of 2024***.
>
> ***
>
> Developing drugs, conducting clinical trials and commercializing products is expensive and we will need to raise substantial additional funds to achieve our strategic objectives. Although ***we believe our existing cash and other resources will be sufficient to fund our current projected cash requirements into the first half of 2024***, we will require additional financing in the future to fund our operations.
>
> ***
>
> Although the Company has succeeded in generating significant revenues from a number of out-licensing transactions in the past, it cannot determine with reasonable certainty if and when it will become profitable on a current basis. ***Management believes that the Company's current cash and other resources will be sufficient to fund its projected cash requirements into the first half of 2024.*** However, in the event that the Company does not begin to generate sustainable cash flows from its operating activities in the future, the Company will need to carry out significant cost reductions or raise additional funding.

61.    On March 16, 2022, BioLineRx filed a Form 6-K with the SEC, signed by Defendant Serlin, along with a press release, as Exhibit 1, announcing the Company's financial results for the quarter ended December 31, 2021.  The March 16, 2022 press release stated, in relevant part (emphasis added):

"The opportunity for Motixafortide in stem-cell mobilization is significant," said Philip Serlin, Chief Executive Officer of BioLineRx. "We recently commissioned a comprehensive third-party market assessment which identified a $360 million addressable annual opportunity in the US. We continue to maintain optionality among a number of commercialization alternatives, as we believe the very concentrated end market, where approximately 80 transplant centers in the US conduct the vast majority of stem cell transplant procedures, would require a limited commercialization footprint. In the meantime, in order to ensure that Motixafortide is well positioned for a timely and robust US launch that will maximize the value of the asset, we have initiated a number of pre-commercialization launch activities.["]

"Following our very productive pre-NDA meeting with FDA that we completed in December, we are diligently working to submit the NDA and position the product for commercialization. We anticipate the NDA submission will occur in mid-2022.["]

***"With over $57 million in cash, we believe we are well financed to extract maximum value from Motixafortide in SCM while at the same time advancing our other pipeline programs."***

62.    BioLineRx also held an earnings call for the fourth quarter of 2021 on March 16, 2022 ("March 16, 2022 Earnings Call").  During the March 16, 2022 Earnings Call, Defendant Serlin summarized the Company's key upcoming milestones, which included potential FDA approval and U.S. launch of Motixafortide for SCM in 2023:

I would like to take a few moments to summarize our key milestones. First, in mid-2022, submission of an NDA to the FDA for Motixafortide as a novel mobilization agent for multiple myeloma patients undergoing autologous stem cell transplantation.  Then announced initial results for Part 2 of the Phase 1/2a trial of AGI-134 in solid tumors in the second half of 2022.  And as far as some sightly longer-term milestones, initiation of a Phase II study for AGI-134 in 2023,

potential FDA approval of Motixafortide in 2023 and potential U.S. launch of Motixafortide in stem cell mobilization in 2023.

63.    During the same March 16, 2022 Earnings Call, Defendant Zeevi stated that "the company held $57.1 million of cash, cash equivalents and short-term bank accounts as of December 31, 2021. *We believe we are well financed to achieve multiple potentially value creating milestones*."  (Emphasis added.)

64.    The March 16, 2022 statements contained in ¶¶ 60-61 and 63 were false and/or misleading statements and/or failed to disclose that (i) the Company did not have enough funds to execute its strategy to develop Motixafortide in SCM, while at the same time advancing other pipeline programs, through the first half of 2024; and (ii) the Company would need significant additional funding by 2022 in order to fund its operations and pipeline programs.

**May 11, 2022 Statements**

65.    On May 11, 2022, BioLineRx filed a Form 6-K with the SEC, signed by Defendant Serlin, along with a press release, filed as Exhibit 1, announcing the Company's financial results for the quarter ended March 31, 2022 (the "May 11, 2022 press release).  The May 11, 2022 press release stated, in relevant part (emphasis added):

> "During the first quarter and subsequent period, we continued to prepare our New Drug Application for Motixafortide in stem cell mobilization, and we remain on track for submission to the FDA mid-year, consistent with our prior guidance," stated Philip Serlin, Chief Executive Officer of BioLineRx. "In parallel, we are advancing a range

of critical pre-launch activities, should Motixafortide be approved, while maintaining full optionality with respect to our commercialization plans, in light of the highly concentrated end market in the U.S., in which 80 transplant centers conduct the vast majority of stem cell transplant procedures.["]

*"With over $50 million in cash, we believe we are well financed to extract maximum value from Motixafortide in stem cell mobilization while at the same time advancing our other pipeline programs, allowing us to achieve notable corporate and clinical milestones into the first half of 2024,"* concluded Mr. Serlin.

66.    The May 11, 2022 press release also stated that "upcoming *expected* milestones" included: "Submission of NDA to FDA for Motixafortide as novel mobilization agent for multiple myeloma patients undergoing autologous stem cell transplantation in mid-2022; Initial results from Part 2 of Phase 1/2a trial of AGI-134 in solid tumors in H2 2022; Initiate Phase 2 study of AGI-134 in 2023; Potential FDA approval of Motixafortide in 2023; [and] Potential US launch of Motixafortide in SCM in 2023."

67.    The May 11, 2022 press release further stated that BioLineRx *"ended the first quarter on solid financial footing, with cash and cash equivalents of $50.6 million, sufficient to fund operations, as currently planned, into the first half of 2024."* (Emphasis added.)

68.    Exhibit 2 to the Company's May 11, 2022 Form 6-K is the Company's Condensed Consolidated Interim Financial Statements (Unaudited) as of March 31,

2022 (the "March 31, 2022 Unaudited Financial Statements"). Note 1 to the March

31, 2022 Unaudited Financial Statements states (emphasis added):

> Although the Company has succeeded in generating significant revenues from a number of out-licensing transactions in the past, it cannot determine with reasonable certainty if and when it will become profitable on a current basis. ***Management believes that the Company's current cash and other resources will be sufficient to fund its projected cash requirements into the first half of 2024.*** However, in the event that the Company does not begin to generate sustainable cash flows from its operating activities in the future, the Company will need to carry out significant cost reductions or raise additional funding.

69.     Exhibit 3 to the May 11, 2022 Form 6-K is the Company's "Operating

and Financial Review" that states (emphasis added):

> Developing drugs, conducting clinical trials and commercializing products is expensive and we will need to raise substantial additional funds to achieve our strategic objectives. Although ***we believe our existing cash and other resources will be sufficient to fund our current projected cash requirements into the first half of 2024***, we will require additional financing in the future to fund our operations.

70.     BioLineRx also held an earnings call for the first quarter of 2022 on

May 11, 2022 ("May 11, 2022 Earnings Call"). During the May 11, 2022 Earnings

Call, Defendant Zeevi stated that "the company held $50.6 million of cash, cash

equivalents and short term bank deposits as of March 31, 2022. ***We believe we are***

***well financed to achieve multiple potentially value creating … milestones into the***

***first half of 2024."*** (Emphasis added.) As stated in the May 11, 2022 press release,

upcoming expected milestones included potential FDA approval and U.S. launch of

Motixafortide in SCM in 2023.

71.    The May 11, 2022 statements contained in ¶¶ 65 and 67-70 were false and/or misleading statements and/or failed to disclose that (i) the Company did not have enough funds to execute its strategy to develop Motixafortide in SCM, while at the same time advancing other pipeline programs, through the first half of 2024; and (ii) the Company would need significant additional funding by 2022 in order to fund its operations and pipeline programs.

**August 16, 2022 Statements**

72.    On August 16, 2022, BioLineRx filed a Form 6-K with the SEC, signed by Defendant Serlin, along with a press release, filed as Exhibit 1, announcing the Company's financial results for the quarter ended June 30, 2022.  The press release discussed, *inter alia*, the "significant events and achievements during the second quarter [of] 2022 and [the] subsequent period" (emphasis added):

> Progressed the New Drug Application (NDA) for Motixafortide in stem cell mobilization (SCM), with submission to the FDA expected within the next 4-6 weeks; …

> Continued to advance critical pre-launch activities with respect to Motixafortide commercialization in the U.S., if approved; … [and]

> ***Ended the second quarter on solid financial footing, with cash and cash equivalents of $43.2 million, sufficient to fund operations, as currently planned, into the first half of 2024."***

> "Since our last quarterly update, we achieved significant progress across both our Motixafortide stem cell mobilization and pancreatic cancer (PDAC) programs," stated Philip Serlin, Chief Executive Officer of BioLineRx….

"In summary, we believe we are well-positioned to deliver several meaningful potential regulatory, commercial and clinical catalysts over the next 12-18 months," concluded Mr. Serlin.

73.    Exhibit 2 to the Company's August 16, 2022 Form 6-K is the Company's Condensed Consolidated Interim Financial Statements (Unaudited) as of June 30, 2022 (the "June 30, 2022 Unaudited Financial Statements").  Note 1 to the June 30, 2022 Unaudited Financial Statements states (emphasis added):

> Although the Company has succeeded in generating significant revenues from a number of out-licensing transactions in the past, it cannot determine with reasonable certainty if and when it will become profitable on a current basis. ***Management believes that the Company's current cash and other resources will be sufficient to fund its projected cash requirements into the first half of 2024.*** However, in the event that the Company does not begin to generate sustainable cash flows from its operating activities in the future, the Company will need to carry out significant cost reductions or raise additional funding.

74.    Exhibit 3 to the August 16, 2022 Form 6-K is the Company's "Operating and Financial Review" that states (emphasis added):

> Developing drugs, conducting clinical trials and commercializing products is expensive and we will need to raise substantial additional funds to achieve our strategic objectives. Although ***we believe our existing cash and other resources will be sufficient to fund our current projected cash requirements into the first half of 2024***, we will require additional financing in the future to fund our operations.

75.    BioLineRx held an earnings call for the second quarter of 2022 on August 16, 2022 (the "August 16, 2022 Earnings Call").  During the August 16, 2022 Earnings Call, Defendant Zeevi stated that "the company held $43.2 million of cash, cash equivalents and short-term bank deposits as of June 30, 2022. ***We believe***

*we are well financed to achieve multiple potentially value-creating milestones into the first half of 2024*." (Emphasis added.) And during that same earnings call, Defendant Serlin stated: *"as far as the cash runway, we mentioned that we have $43 million in cash, which, again, as we mentioned, is enough to take us through our major upcoming milestones…."* (Emphasis added.) As previously stated during the March 16, 2022 Earnings Call and in the May 11, 2022 press release, upcoming milestones included potential FDA approval and the U.S. launch of Motixafortide in SCM in 2023.

76.     The August 16, 2022 statements contained in ¶¶ 72-75 were false and/or misleading statements and/or failed to disclose that (i) the Company did not have enough funds to execute its strategy to develop Motixafortide in SCM, while at the same time advancing other pipeline programs, through the first half of 2024; and (ii) the Company would need significant additional funding by 2022 in order to fund its operations and pipeline programs.

**September 1, 2022 Statements**

77.     As late as September 1, 2022, the Company assured investors that it had a compelling valuation and financial condition *with sufficient cash until the first half of 2024* to execute its strategy for Motixafortide in SCM, which included its commercial U.S. launch in 2023, while at the same time advancing other pipeline

programs.   On September 1, 2022, the Company posted a "Corporate Presentation,"

dated September 1, 2022, to its website, which states:



78.     The September 1, 2022 statements contained in ¶ 77 were false and/or

misleading statements and/or failed to disclose that (i) the Company did not have

enough funds to execute its strategy to develop Motixafortide in SCM, while at the

same time advancing other pipeline programs, through the first half of 2024; and

(ii) the Company would need significant additional funding by 2022 in order to fund

its operations and pipeline programs.

**The Truth Emerges**

79.     On September 15, 2022, BioLineRx filed a Form 6-K with the SEC,

signed by Defendant Serlin, along with a press release.  The press release stated, in

28

relevant part, that the Company entered in a $40 million ***non-dilutive*** secured debt financing agreement with Kreos Capital and "intends to use the available funds from this agreement, together with cash on-hand, ***to support an aggressive commercial launch for Motixafortide in autologous stem cell mobilization for multiple myeloma patients, if approved, while it continues to evaluate U.S. commercialization strategies.***" (Emphasis added.)

80.     More specifically, the Form 6-K stated, in relevant part (emphasis added):

> On September 14, 2022, BioLineRx Ltd. (the "Company") entered into an Agreement for the Provision of a Loan Facility (the "Loan Agreement") with Kreos Capital VII Aggregator SCSP (the "Lender"). Under the Loan Agreement, the Lender will provide the Company with access to term loans in an aggregate principal amount of up to $40 million in three tranches as follows: (a) a loan in the aggregate principal amount of up to $10 million, available for drawdown upon closing of the Loan Agreement and until April 1, 2023 ("Tranche A"), (b) a loan in the aggregate principal amount of up to $20 million, available for drawdown upon achievement of certain milestones and until April 1, 2024 ("Tranche B"), and (c) a loan in the aggregate principal amount of up to $10 million, available for drawdown upon achievement of certain milestones and until October 1, 2024, ("Tranche C", together with Tranche A and Tranche B, the "Loan" or "Loans").
>
> The Company intends to use the proceeds of the Loans, together with cash on-hand, ***to facilitate the commercial launch of Motixafortide in autologous stem cell mobilization for multiple myeloma patients, as well as for general corporate purposes***.

81.     The Loan Agreement with Kreos Capital was signed by Defendant Serlin.

82.     On Monday, September 19, 2022, pre-market, BioLineRx filed a Form 6-K with the SEC, signed by Defendant Serlin, along with a press release.  After emphasizing on September 15, 2022 that the Company had entered into a non-dilutive debt financing agreement, the September 19, 2022 press release disclosed, in relevant part, that the Company agreed to sell its ADSs in a direct offering to certain institutional investors – ***at a steep discount of almost 30%*** – ***to raise $15 million to facilitate the commercial launch of Motixafortide in SCM and for general corporate purposes*** (the "Direct Offering"):

> [The Company has] entered into definitive agreements with several institutional investors for the issuance and sale in a registered direct offering of 13,636,365 of the Company's American Depositary Shares (ADSs) and warrants to purchase up to an aggregate of 13,636,365 ADSs, ***at a combined purchase price of $1.10 per ADS and associated warrant***. Each ADS represents fifteen (15) ordinary shares, par value NIS 0.10 per share, of BioLineRx. The offering is expected to close on or about September 21, 2022, subject to satisfaction of customary closing conditions.
>
> ***
>
> ***The gross proceeds from the offering*** (without taking into account any proceeds from any future exercises of warrants issued in the private placement), before deducting the placement agent's fees and other offering expenses payable by the Company, ***are expected to be $15 million. BioLineRx intends to use the net proceeds to facilitate the commercial launch of Motixafortide in autologous stem cell mobilization for multiple myeloma patients and general corporate purposes, which may include working capital and funding clinical trials***.

(Emphasis added.)

83. ***The $1.10 purchase price per ADS is a discount of almost 30% compared to the $1.54 closing price on Friday, September 16, 2022***.

84. On this news, the price of BioLineRx's ADS fell $0.52, or approximately 34%, to close at $1.02 per ADS on September 19, 2022, damaging investors.

## ADDITIONAL SCIENTER ALLEGATIONS

### A. The Individual Defendants Benefitted Financially from the Fraud

85. As explained below, the Individual Defendants benefitted financially from the fraud.

#### 1. Special Bonus

86. According to the Company's Compensation Policy, the Individual Defendants could receive "a special bonus" "on the occurrence of significant events, such as" "[c]ompleting a substantial funding event (*not less than $15 million*)." (Emphasis added.)

87. The Individual Defendants' special bonus was each capped at "up to 4 monthly salaries."

88. Accordingly, for 2022, Defendant Serlin was eligible for a special bonus of up to $99,000 for raising $15 million in capital because of the Direct Offering (since his annual salary for 2022 was $297,000).

89.    For 2022, Defendant Zeevi was eligible for a special bonus of up to $64,333 for raising $15 million in capital because of the Direct Offering (since her annual salary for 2022 was $193,000).[2]

### 2.    Annual Bonus

90.    According to the Compensation Policy, "success in raising capital" was considered a "measurable personal objective" and one of the "performance metrics" considered for purposes of an executive's annual bonus.  "Meeting measurable personal objectives," which includes "success in raising capital," was assigned a weight of "15% to 25%" for purposes of determining an executive's annual bonus. Defendant Serlin and Defendant Zeevi's annual bonuses were capped at "8 monthly salaries" and "6 monthly salaries," respectively.

### 3.    Serlin and Zeevi's Bonuses for 2021 and 2022

#### a.    Serlin's 2022 Bonuses

91.    The Company's Form 20-F for the fiscal year ended December 31, 2022, filed with the SEC on March 22, 2023, states that Serlin's total compensation for 2022 was $1,036,000, ***including $238,000 in bonuses***:

| | |
|---|---|
| Salary | $  297,000 |
| **Bonuses** | **238,000** |

---

[2] The Individual Defendants likely were not eligible for the special bonus as a result of the $40 million non-dilutive secured debt financing agreement with Kreos Capital disclosed on September 15, 2022 because the $40 million is available in tranches and only the first tranche of $10 million was available as of the agreement's closing with no required milestones.

| | |
|---|---|
| Value of Option Granted[3] | 401,000 |
| Social Benefits[4] | 80,000 |
| All Other Compensation[5] | $    20,000 |
| Total Compensation | $1,036,000 |

92.     Serlin's bonuses of $238,000 includes both special and annual bonuses. As stated above, in 2022, Serlin was eligible for a special bonus of up to $99,000 pursuant to the Company's Compensation Policy for raising $15 million in capital for the Direct Offering.   The Direct Offering also helped to increase his annual bonus, which was capped at $148,500 pursuant to the Company's Compensation Policy.

### b.     Zeevi's 2022 Bonuses

93.     The Company's Form 20-F for the fiscal year ended December 31, 2022, filed with the SEC on March 22, 2023, states that Zeevi's total compensation for 2022 was $484,000, *including $122,000 in bonuses*:

| | |
|---|---|
| Salary | $   193,000 |
| **Bonuses** | **122,000** |
| Value of Option Granted | 102,000 |
| Social Benefits | 47,000 |
| All Other Compensation | $    18,000 |

---

[3] "Value of Option Granted" consists of amounts recognized as share-based compensation expense on the Company's statement of comprehensive loss for the year ended December 31, 2022.

[4] "Social Benefits" include payments to the National Insurance Institute, advanced education funds, managers' insurance and pension funds, vacation pay and recuperation pay as mandated by Israeli law.

[5] "All other Compensation" includes automobile-related expenses pursuant to the Company's automobile leasing program, telephone, basic health insurance and holiday presents.

Total Compensation                    $   482,000

94.    Zeevi's bonuses of $122,000 includes both special and annual bonuses. As stated above, in 2022, Zeevi was eligible for a special bonus of up to $64,333 pursuant to the Compensation Policy for raising $15 million in capital for the Direct Offering. The Direct Offering also helped to increase her annual bonus, which was capped at $96,500 pursuant to the Company's Compensation Policy.

### c.    By January 2021, Both Serlin and Zeevi Were Eligible for Their Maximum Special Bonuses That They Would Later Receive

95.    In January 2021, prior to the Class Period, the Company raised capital by selling $14,375,000 ADSs in a public offering at $2.40 per ADS, resulting in gross proceeds of $34.5 million.

96.    The Company's Form 20-F for the fiscal year ended December 31, 2021, filed with the SEC on March 16, 2022 (the "2021 20-F"), states that Serlin's total compensation for 2021 was $904,000, including a salary of $290,000 and *$251,000 in bonuses*. Based on the Company's Compensation Policy, *Serlin's bonuses for 2021 were capped at $289,999*.

97.    The 2021 20-F states that Zeevi's total compensation for 2021 was $458,000, including a salary of $186,000 and *$135,000 in bonuses*. Based on the Company's Compensation Policy, *Zeevi's bonuses for 2021 were capped at $155,000*.

98.    The Individual Defendants' bonuses for 2021 likely resulted from Serlin and Zeevi's success in raising $34.5 million in capital for the Company in January 2021.  As a result, in January 2021, both Serlin and Zeevi became eligible for their maximum special bonuses for the entire year, totaling four monthly salaries equal to $96,666 and $62,000, respectively.

           **d.**      **Defendants Misled the Market Regarding the Company's Needs for Capital So That the Individual Defendants Could Receive Large Special Bonuses in 2022 That They Otherwise Would Not Have Been Eligible to Receive in 2021**

99.    Defendants misled the market to believe the Company had sufficient cash until the first half of 2024 to execute its strategy for Motixafortide in SCM, while at the same time advancing other pipeline programs.  Defendants' omissions and continuous touting, as late as September 1, 2022, artificially increased the price of the Company's ADS and helped to raise additional capital via the debt and equity financing disclosed in mid-September 2022. The Individual Defendants received large bonuses in 2022 as a result of the $15 million Direct Offering, which included additional special bonuses that the Individual Defendants otherwise would not have been eligible to receive had Defendants raised the $15 million in capital in 2021.

4.     **After Shareholders Failed to Approve a Proposal in July 2022 Regarding Serlin's Equity Compensation, Serlin Was Even More Determined to Raise Capital and Earn a Bonus in 2022**

100.   Serlin was even more determined to raise capital and earn bonuses in the summer of 2022 when shareholders failed to approve a proposal regarding his equity compensation in July 2022.

101.   More specifically, in May 2022, the Company's Compensation Committee and the Board of Directors approved the grant to Serlin of options to purchase 4,194,800 Ordinary Shares (equivalent to 279,653 ADSs) and 3,073,600 Performance Stock Units (equivalent to 204,907 ADSs).

102.   Pursuant to Israel Companies Law, arrangements regarding the compensation of the Company's CEO require the approval of the Compensation Committee, the Board of Directors and the shareholders, in that order.

103.   However, shareholders who participated in the Annual General Meeting of Shareholders held on July 3, 2022, failed to approve the proposed equity compensation to Serlin.

B.     **Defendants Knew in the Summer of 2022 That the Company Would Likely Self-Commercialize Motixafortide in SCM**

104.   Eight days after BioLineRx's ADS dropped approximately 34% because of the Company's corrective disclosures, BioLineRx filed a Form 6-K with the SEC on September 27, 2022, signed by Defendant Serlin, along with a press

36

release.  The September 27, 2022 press release states, in relevant part, that, if the FDA approves Motixafortide, the Company intends to commercialize the drug in the U.S. independently in order to accelerate its availability to patients and maximize the value of the drug.  "To support a robust commercial launch, the Company will employ a small and targeted sales force to support outreach to this well-defined community."

105.   But having just submitted its New Drug Application to the FDA for Motixafortide in SCM five days earlier on September 12, 2022, Defendants admittedly knew that potential FDA approval would not be granted until some point in 2023.  (On November 10, 2022, the Company announced the FDA's acceptance of the NDA for APHEXDA (Motixafortide) and a target action date of September 9, 2023.)

106.   During the Class Period, the Company stated that it continued to maintain "full optionality" among a number of commercialization alternatives, and one of those alternatives was commercializing the drug in the U.S. independently, which, according to the Company, would only require a limited commercialization footprint due to a very concentrated end market, where approximately 80 transplant centers in the U.S. conduct the vast majority of stem cell transplant procedures.

107.   With these "commercialization alternatives" and the need for a "limited commercialization footprint," investors had every reason to believe Defendants'

statements that the Company had sufficient cash to fund operations into the first half of 2024 whether or not the Company decided to independently commercialize the drug.

108.    Additionally, it has been reported in an October 18, 2022 article entitled "Fire Phil Serlin," that Holly May, who served as the Company's Chief Commercial Officer from June 2022 to September 2022,[6] stated at a September 28, 2022 Investor and Key Opinion Leader Webinar presentation that in her early days at BioLineRx – arguably June/July 2022 since Ms. May was at the Company for only four months prior to the presentation – the Company had conducted a deep analysis of the commercialization options and self-commercialization was a much more attractive option from a cost perspective. *In other words, Defendants knew in the summer of 2022 that the Company would likely self-commercialize Motixafortide in SCM.* For this reason, when the Company issued a press release on August 16, 2022 stating that the Company "[e]nded the second quarter on solid footing and cash equivalents of $43.2 million, sufficient to fund operations, *as currently planned*, into the first half of 2024," self-commercialization was already part of those plans.

---

[6] Holly May continues to serve at BioLineRx USA's President since September 2022.

C. **The Timing between the Alleged False and/or Misleading Statements and the September 15, 2022 and September 19, 2022 Announcements Bolsters Plaintiffs' Scienter Allegations**

109.    The closeness in time of the alleged false and/or misleading statements and the September 15, 2022 and September 19, 2022 announcements bolsters Plaintiffs' scienter allegations.

110.    Plaintiffs explain, with the assistance of William Purcell, an investment banker with over 50 years of experience (including 25 years at Dillon, Read & Co. Inc., and 8 years as a Managing Director of the firm), that Company management most likely began its thought process with respect to the Kreos Capital loan and the Direct Offering a significant period of time, perhaps months, prior to the September 15, 2022 and September 19, 2022 announcements.

111.    Mr. Purcell is currently a Senior Advisor of Seale & Associates, an investment bank in the Washington D.C. area. During his career, he has participated in over 100 financings, both equity and debt - both public financings and private placements. For a period of time, he was the co-head of Dillon Read's private placement department.  He has also participated in over 100 M&A transactions, and has signed numerous fairness opinions.  His first investment banking expert witness assignment was for a client at Dillon Read in 1976 - and he has since been an investment banking expert witness in over 225 cases involving numerous areas of investment banking and financing issues as well as M&A issues. He received a

Bachelor of Arts (Economics) from Princeton University and an MBA from New York University Graduate School of Business.

112.    The allegations in the remainder of this section are alleged to be true based on information provided by Mr. Purcell. These allegations have been reviewed by Mr. Purcell and he believes they reflect expert opinions he would provide in a formal expert report if requested to do so at a future date.

113.    Given the fact that the Company announced on September 15, 2022 that it had entered into a major debt transaction, and then, on September 19, 2022, that it had entered into a major equity transaction involving a direct equity offering of its ADSs at an approximate discount from current market of almost 30 percent to raise an additional $15 million, it is apparent from an investment banking point of view that Company management most likely began its thought process for such a major financing package a significant period of time, perhaps months, prior to the announcements.

114.    Any private placement securities transaction, given the disclosure requirements of the U.S. securities laws as well as the extensive due diligence generally needed by potential investors in regard to a non-seasoned company, would generally take a significant amount of time from start to completion.

115.    Generally, a team of senior Company management, its counsel knowledgeable in financing transactions, and an investment bank placement agent

would be retained - with engagement agreements negotiated. A detailed Offering Memorandum would generally need to be prepared for potential investors to study. These potential investors (in this matter both potential debt and equity investors) would generally undertake significant due diligence in meeting with senior management and key Company employees, will ask numerous detailed and probing questions as well as often requesting additional documents and information from the Company - and often even retaining an outside expert in the area of the Company's expertise to confirm certain data and potential prospects of the Company's products. Finally, tedious negotiations often are required in connection with the language and representations pertaining to the finalized financing documents, especially in regard to transactions involving debt and equity from different parties each attempting to best protect its own interests. This task alone can take weeks before a closing can take place.

116.   All of the above steps would generally be time consuming, perhaps covering months. This conclusion would be compounded perhaps by the additional negotiations needed to get the Company to agree to a discount relating to its equity securities of as much as 30 percent.

## D.     Serlin Was Very Hands-On and Involved with Day-To-Day Operations

117.   Serlin is the type of CEO who never fully separates himself from day-to-day operations at BioLineRx.

118.   Confidential Witness ("CW") No. 1 was a Medical Manager at the Company from February 2019 through October 2021, who reported to Mrs. Adi Weinstein and Mrs. Orit Glick.  CW-1 was engaged in all research and development matters at the Company.

119.   According to CW-1, the Company held bi-weekly meetings which were attended by almost all Company employees, including Serlin, other C-suite executives, and board members.  In total, about 50 people attended these meetings which took place at the Company's offices and lasted approximately 45 minutes to one hour.  The meetings were dedicated to updates on research and questions.  CW-1 interacted with Serlin at the bi-weekly meetings.

120.   CW-1 also interacted with Serlin at other meetings which were held at the Company's offices, included about 10 employees, and typically lasted about 15 minutes.  In these meetings, Serlin asked questions about the progress of the research and discussed the molecules that were being researched, including the design of molecules.

121.   As far as managerial style, CW-1 described Serlin as someone who shared information only on a "need to know" basis with employees. Although CW-1 did not pay attention to financial matters, CW-1 added that senior management were always busy with funding and financing, and this was "in the air."

122.   Serlin also regularly interacted with Project Managers.  CW-2, who was employed at the Company from July 2021 through November 2022 as a Project Manager, reported directly to Serlin.   CW-2's position included professional development of the project and operating within a budget.  CW-2 met with Serlin several times and discussed the budget for the AGI-134 project.

123.   CW-3 was also a Projects Manager, as well the Director of Clinical Pharmacology.  CW-3 worked at the Company from March 2018 until May 2022, first as Associate Director of Clinical Pharmacology from March 2018 to January 2019, and then Director of Clinical Pharmacology thereafter.  CW-3 was in charge of developing clinical tests, designing the clinical tests and working with outside providers of services and clinical solutions.  CW-3 reported to Mrs. Ella Sorani, Chief Development Officer.  CW-3 reported that he/she had many interactions with Defendant Serlin.  CW-3 participated in "hundreds" of meetings that Serlin attended during which clinical pharmacology requirements, tests planning and all aspects of clinical research was discussed.  CW-3 also met with Serlin frequently.

124.   CW-4 was employed at the Company from 2019 until June 2020 as a Projects Manager.  CW-4 reported to Mrs. Ella Sorani, Chief Development Officer, and Mrs. Tami Rachmilevitz, Chief Medical Officer, and both officers reported to Serlin.   CW-4 was involved in three projects involving molecules development.  CW-4's main project was Motixafortide for SCM.  CW-4 reported that he/she met

with Serlin on a weekly basis regarding his/her three projects. Each meeting related to one of these projects and the subject of the meeting related to technical aspects of the projects. Serlin would typically ask some questions and leave the meeting after 30 minutes to one hour.

125.   CW-4 added that the Company's hierarchy was strict and that matters that rose to board level meetings were not shared with employees at CW-4's level.

### E.    Core Operations

126.   Because Motixafortide in SCM was the Company's lead drug candidate during the Class Period, Defendants cannot credibly dispute knowledge of the materially adverse, non-public information that contradicted their public statements during the Class Period that the Company had sufficient cash until the first half of 2024 to execute its strategy for Motixafortide in SCM, which included its commercial U.S. launch, while at the same time advancing other pipeline programs.

127.   Analysts routinely focused on Motixafortide in SCM as the main driver behind BioLineRx's value. For example, on May 5, 2021, H.C. Wainwright & Co. described Motixafortide (BL-8040) as the Company's lead asset and basis for valuing BLRX shares (emphasis added):

> **Valuation and risks to price target achievement**. We reiterate our Buy rating and $19 price target. We note that there is still a relatively large delta between the current share price and our target, which we see as largely attributable to the low number of shares outstanding post reverse split. ***Our valuation is based on our clinical net present value***

*(NPV) model, which is currently driven by the company's lead asset, BL-8040 [Motixafortide].*

128.    The success of Motixafortide in SCM was therefore paramount within the Company and essential to each of the Individual Defendants.  Thus, Defendants cannot credibly dispute their knowledge of the adverse facts alleged herein.

### F.    Corporate Scienter

129.    BioLineRx's public statements misled investors to believe the Company had sufficient cash until the first half of 2024 to execute its strategy for Motixafortide in SCM, which included its commercial U.S. launch, while at the same time advancing other pipeline programs.  Given the dramatic allegations of falsity contained herein, a strong inference exists that CEO Serlin and CFO Zeevi knew of the falsity of the statements at the time of publication.

130.    The Individual Defendants were acting within their normal scopes of employment when making the fraudulent statements described above.  Consequently, their scienter is imputed to BioLineRx under the doctrine of *respondeat superior* and common law principles of agency.

## CLASS ACTION ALLEGATIONS

131.    Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired BioLineRx ADSs during the Class Period (the "Class"); and were damaged upon the revelation of the alleged corrective

disclosures. Excluded from the Class are Defendants herein, the officers and directors of BioLineRx, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns, and any entity in which Defendants have or had a controlling interest.

132.    The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, BioLineRx ADSs were actively traded on the NASDAQ until the ticker symbol BLRX. While the exact number of Class members is unknown to Plaintiffs at this time and can be ascertained only through appropriate discovery, Plaintiffs believe that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by BioLineRx or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

133.    Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

134.    Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation.  Plaintiffs have no interests antagonistic to or in conflict with those of the Class.

135.   Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

- whether the federal securities laws were violated by Defendants' acts as alleged herein;

- whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business and operations of the Company;

- whether the prices of the Company's ADSs during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

136.   A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

137.   Plaintiffs will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

- the omissions and misrepresentations were material;

- the Company's ADSs are traded in an efficient market;

- the Company's ADSs were liquid and traded with moderate to heavy volume during the Class Period;

- the Company traded on the NASDAQ and was covered by multiple analysts;

- the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's ADSs; and

- Plaintiffs and members of the Class purchased, acquired and/or sold BioLineRx ADSs between the time the Defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

138. Based upon the foregoing, Plaintiffs and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

139. Alternatively, Plaintiffs and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128, 92 S. Ct. 2430 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

## COUNT I

## (Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder Against All Defendants)

140. Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

141.   This Count is asserted against Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

142.   During the Class Period, Defendants engaged in a plan, scheme, and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon Plaintiffs and the other members of the Class; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities.   Such scheme was intended to, and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiffs and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of BioLineRx ADSs; and (iii) cause Plaintiffs and other members of the Class to purchase or otherwise acquire BioLineRx ADSs at artificially inflated prices.   In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each of them, took the actions set forth herein.

143.   Pursuant to the above plan, scheme, and course of conduct, each of the Defendants participated directly or indirectly in the preparation and/or issuance of SEC filings, press releases and other statements and documents described above,

including statements made to securities analysts and the media that were designed to influence the market for the Company's ADSs.  Such filings, releases and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about BioLineRx's business.

144.  By virtue of the Individual Defendants' positions at the Company, Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiffs and the other members of the Class, or, in the alternative, Defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to Defendants.  Said acts and omissions of Defendants were committed willfully or with reckless disregard for the truth.  In addition, each Defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

145.  Information showing that Defendants acted knowingly or with reckless disregard for the truth is peculiarly within Defendants' knowledge and control.  As CEO and CFO of the Company, Defendants Serlin and Zeevi had knowledge of the details of the Company's internal affairs.

146.    The Individual Defendants are liable both directly and indirectly for the wrongs complained of herein.  Because of their positions of control and authority, the Induvial Defendants were able to and did, directly or indirectly, control the content of the Company's statements and had a duty to disseminate timely, accurate, and truthful information with respect to the Company's businesses, operations, and future prospects.  As a result of the dissemination of the aforementioned false and misleading filings, press releases and public statements, the market price of BioLineRx was artificially inflated throughout the Class Period.  In ignorance of the adverse facts concerning the Company's business which were concealed by Defendants, Plaintiffs and the other members of the Class purchased or otherwise acquired BioLineRx ADSs at artificially inflated prices and relied upon the price of the securities, the integrity of the market for the securities and/or upon statements disseminated by Defendants, and were damaged thereby.

147.    During the Class Period, BioLineRx ADSs were traded on an active and efficient market.  Plaintiffs and the other members of the Class, relying on the materially false and misleading statements described herein, which the Defendants made, issued or caused to be disseminated, or relying upon the integrity of the market, purchased or otherwise acquired BioLineRx ADSs at prices artificially inflated by Defendants' wrongful conduct.  Had Plaintiffs and the other members of the Class known the truth, they would not have purchased or otherwise acquired said

securities, or would not have purchased or otherwise acquired them at the inflated prices that were paid.  At the time of the purchases and/or acquisitions by Plaintiffs and the Class, the true value of BioLineRx ADSs were substantially lower than the prices paid by Plaintiffs and the other members of the Class.  The market price of BioLineRx ADSs declined sharply upon public disclosure of the facts alleged herein to the injury of Plaintiffs and Class members.

148.   By reason of the conduct alleged herein, Defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

149.   As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and the other members of the Class suffered damages in connection with their respective purchases, acquisitions and sales of the Company's securities during the Class Period, upon the disclosure of the truth to the investing public.

## COUNT II

### (Violations of Section 20(a) of the Exchange Act Against the Individual Defendants)

150.   Plaintiffs repeat and reallege each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

151.   During the Class Period, the Individual Defendants participated in the operation and management of BioLineRx, and conducted and participated, directly and indirectly, in the conduct of the Company's business affairs.  Because of their

senior positions, they knew about the adverse non-public information with respect to which Plaintiffs and the other members of the Class complain.

152.   As CEO and CFO of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to BioLineRx's business and operations, and to correct promptly any public statements issued by BioLineRx's which had become materially false or misleading.

153.   Because of their positions of control and authority as CEO and CFO of the Company, the Individual Defendants were able to, and did, control the contents of the various filings, press releases and public filings which Defendants disseminated in the marketplace during the Class Period.  Throughout the Class Period, the Individual Defendants exercised their power and authority to cause the Company to engage in the wrongful acts complained of herein. Each Individual Defendant, therefore, was a "controlling person" of BioLineRx within the meaning of Section 20(a) of the Exchange Act.  In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of BioLineRx ADSs.

154.   By reason of their positions as CEO and CFO of the Company, the Individual Defendants had the power to direct the actions of, and exercised the same to cause, the Company to engage in the unlawful acts and conduct complained of herein.  The Individual Defendants exercised control over the general operations of

the Company and possessed the power to control the specific activities which comprise the primary violations about which Plaintiffs and the other members of the Class complain.

155.   By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by BioLineRx.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs demand judgment against Defendants as follows:

A.    Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiffs as the Class representatives;

B.    Requiring Defendants to pay damages sustained by Plaintiffs and the Class by reason of the acts and transactions alleged herein;

C.    Awarding Plaintiffs and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D.    Awarding such other and further relief as this Court may deem just and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiffs hereby demand a trial by jury.

Dated: July 5, 2023

Respectfully submitted,

**POMERANTZ LLP**

*/s/ Thomas H. Przybylowski*
  Thomas H. Przybylowski

Jeremy A. Lieberman (admitted *pro hac vice*)
Brenda Szydlo (admitted *pro hac vice*)
Dean P. Ferrogari (admitted *pro hac vice*)
600 Third Avenue, 20th Floor
New York, New York 10016
Telephone: (212) 661-1100
Facsimile: (917) 463-1044
jalieberman@pomlaw.com
bszydlo@pomlaw.com
tprzybylowski@pomlaw.com
dferrogari@pomlaw.com

*Lead Counsel for Plaintiffs and the Proposed Class*

**BRONSTEIN, GEWIRTZ & GROSSMAN, LLC**
Peretz Bronstein
60 East 42nd Street, Suite 4600
New York, New York 10165
Telephone: (212) 697-6484
Facsimile: (212) 697-7296
peretz@bgandg.com

*Additional Counsel to Lead Plaintiff Peter Catanese*

## CERTIFICATION PURSUANT
## TO FEDERAL SECURITIES LAWS

1.      I, Michael Morlock, make this declaration pursuant to Section 27(a)(2) of the Securities Act of 1933 ("Securities Act") and/or Section 21D(a)(2) of the Securities Exchange Act of 1934 ("Exchange Act") as amended by the Private Securities Litigation Reform Act of 1995.

2.      I have reviewed the initial complaint against BioLineRx Ltd. ("BioLineRx" or the "Company") and authorize the filing of an amended complaint on my behalf.

3.      I did not purchase or acquire BiolineRx American Depositary Shares ("ADSs") at the direction of plaintiffs' counsel or in order to participate in any private action arising under the Securities Act or Exchange Act.

4.      I understand that the Court had the authority to select the most adequate lead plaintiff(s) in this action and selected Peter Catanese. I am willing to serve as an additional representative party on behalf of a Class of investors who purchased or otherwise acquired BiolineRx ADSs during the class period, as may be expanded, including providing testimony at deposition and trial, if necessary.

5.      The attached sheet lists all of my transactions in BiolineRx ADSs during the Class Period as specified in the amended complaint.

6.      During the three-year period preceding the date on which this Certification is signed, I have not served or sought to serve as a representative party on behalf of a class under the federal securities laws, apart from this action.

7.      I agree not to accept any payment for serving as a representative party on behalf of the class as set forth in the amended complaint, beyond my *pro rata* share of any recovery, except such reasonable costs and expenses directly relating to the representation of the class as ordered or approved by the Court.

1

8.    I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed _____6/12/2023_____
                    (Date)

DocuSigned by:

*Mike Morlock*
_____
            (Signature)
        4C320278CDB5436...

_____
Michael Morlock
        (Type or Print Name)

2

Schedule 39

**BioLineRx Ltd. (BLRX)**                                             **Michael Morlock**

**List of Purchases and Sales**

| Transaction Type | Date | Number of Shares/Unit | Price Per Share/Unit |
|---|---|---|---|
| Purchase | 5/6/2021 | 100 | $3.6650 |
| Purchase | 5/6/2021 | 100 | $3.6650 |
| Purchase | 5/6/2021 | 500 | $3.6700 |
| Purchase | 5/6/2021 | 100 | $3.6700 |
| Purchase | 5/6/2021 | 50 | $3.6700 |
| Purchase | 5/6/2021 | 2,950 | $3.6800 |
| Purchase | 5/10/2021 | 100 | $3.4300 |
| Purchase | 5/10/2021 | 165 | $3.4300 |
| Purchase | 5/14/2021 | 26 | $2.9366 |
| Purchase | 5/19/2021 | 89 | $2.9482 |
| Purchase | 6/3/2021 | 53 | $2.6677 |
| Purchase | 7/2/2021 | 1,080 | $3.3700 |
| Purchase | 7/13/2021 | 71 | $3.1010 |
| Purchase | 7/13/2021 | 2 | $3.0299 |
| Purchase | 8/16/2021 | 7 | $2.8657 |
| Purchase | 8/17/2021 | 1,715 | $2.7800 |
| Purchase | 1/24/2022 | 130 | $1.7128 |