POMERANTZ LLP
Jeremy A. Lieberman (admitted *pro hac vice*)
Brenda Szydlo (admitted *pro hac vice*)
Thomas H. Przybylowski
Dean P. Ferrogari (admitted *pro hac vice*)
600 Third Avenue, 20th Floor
New York, New York 10016
Telephone: (212) 661-1100
Facsimile: (917) 463-1044
jalieberman@pomlaw.com
bszydlo@pomlaw.com
tprzybylowski@pomlaw.com
dferrogari@pomlaw.com

[*Additional counsel on signature page*]

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| IN RE BIOLINERX LTD. SECURITIES LITIGATION _____ THIS DOCUMENT RELATES TO: Case No. 2:23-cv-00041-BRM-JBC Peter Catanese | Case No. 2:23-cv-00041-BRM-JBC CLASS ACTION |

**PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO
DEFENDANTS' MOTION TO DISMISS THE AMENDED COMPLAINT**

**TABLE OF CONTENTS**

PRELIMINARY STATEMENT ............................................................................1

STATEMENT OF FACTS ..................................................................................7

DEFENDANTS' MISSTATEMENTS DURING THE CLASS PERIOD ...............8

ARGUMENT .......................................................................................................9

    I.      STANDARDS GOVERNING MOTIONS TO DISMISS ...................9

    II.     PLAINTIFFS ADEQUATELY ALLEGE MATERIALLY FALSE
           AND MISLEADING STATEMENTS ................................................10

          A.     The Alleged Misstatements Are Not Protected By the PSLRA's
                 Safe Harbor ...........................................................................11

                 i.     The Alleged Misstatements Are Not Forward
                       Looking....................................................................12

                 ii.    BioLineRx's Cautionary Statements Were
                       Inadequate................................................................14

          B.     The Alleged Misstatements Are Materially False and/or
                 Misleading..............................................................................17

    III.    WHEN VIEWED HOLISTICALLY, THE ALLEGATIONS IN THE
           AMENDED COMPLAINT SUGGEST A STRONG INFERENCE OF
           SCIENTER ........................................................................................20

          A.     The Individual Defendants Benefitted Financially from the
                 Fraud ......................................................................................21

          B.     Serlin Was Even More Determined to Raise Capital and
                 Receive a Special Bonus after Shareholders Failed to Approve a
                 Proposal in July 2022 Regarding His Equity Compensation ...25

         C.     Defendants Knew in the Summer of 2022 That the Company
                 Would Likely Self-Commercialize Motixafortide in SCM ......26

i

D.    The Timing between the Alleged Misstatements and the Corrective Disclosures Suggest That Defendants Knew or Should Have Known Their Statements Were False and/or Misleading ................................................................................28

E.    Core Operations .................................................................29

F.    Serlin Was Very Hands-On and Involved in Day-To-Day Operations .........................................................................30

IV.    PLAINTIFFS STATE A CLAIM UNDER SECTION 20(a) ..............31

CONCLUSION ..................................................................................32

# TABLE OF AUTHORITIES

**Page(s)**

## <u>Cases</u>

*Alberici v. Recro Pharma, Inc.*,
No. CV 18-2279, 2021 WL 798299 (E.D. Pa. Mar. 1, 2021) ...........................19

*Allegheny Cnty. Emps.' Ret. Sys. v. Energy Transfer LP*,
532 F. Supp. 3d 189 (E.D. Pa. 2021)..................................................................31

*Anderson v. StoneMor Partners, L.P.*,
296 F. Supp. 3d 693 (E.D. Pa. 2017).........................................................18, 19

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007).......................................................................................9

*Biondolillo v. Roche Holding AG*,
No. 17-4056, 2018 WL 4562464 (D.N.J. Sept. 24, 2018).................................20

*Cal. Pub. Emps.' Ret. Sys. v. Chubb Corp.*,
No. 00-4285(GEB), 2002 WL 33934282 (D.N.J. June 26, 2002).....................32

*Carmignac Gestion, S.A. v. Perrigo Co. PLC*,
No. 17-10467, 2019 WL 3451523 (D.N.J. July 31, 2019) ..........................12, 14

*Fan v. StoneMor Partners, LP*,
927 F.3d 710 (3d Cir. 2019) ..............................................................................18

*Frank v. Dana Corp.*,
646 F.3d 954 (6th Cir. 2011) .............................................................................25

*Frater v. Hemispherx Biopharma, Inc.*,
996 F. Supp. 2d 335 (E.D. Pa. 2014)................................................................24

*GSC Partners CDO Fund v. Washington*,
368 F.3d 228 (3d Cir. 2004) ..............................................................................14

*In re Aurora Cannabis, Inc. Sec. Litig.*,
No. 19-cv-20588, 2023 WL 5508831 (D.N.J. Aug. 24, 2023)..........................10

ii

*In re Cancer Genetics, Inc. Sec. Litig.*,
No. 2:18-CV-05612-ES-SCM, 2020 WL 3276740 (D.N.J. Feb. 26,
2020) ...................................................................................................21

*In re Celgene Corp. Sec. Litig.*, No. 18-4772,
2019 WL 6909463 (D.N.J. Dec. 19, 2019)........................................................24

*In re: Enzymotec Sec. Litig.*,
No. 14-5556 (JLL) (MAH), 2015 WL 8784065 (D.N.J. Dec. 15,
2015) ...................................................................................................15

*In re Eros Int'l PLC Sec. Litig.*,
No. 19-14125, 2021 WL 1560728 (D.N.J. Apr. 20, 2021) ................................12

*In re Harman Int'l Indus., Inc. Sec. Litig.*,
791 F.3d 90 (D.C. Cir. 2015)...............................................................15

*In re Lattice Semiconductor Corp. Sec. Litig.*,
No. CV04-1255-AA, 2006 WL 538756 (D. Or. Jan. 3, 2006) ..........................25

*In re Majesco Sec. Litig.*,
No. 05-cv-3557 (PGS), 2006 WL 2846281 (D.N.J. Sept. 29, 2006) ................12

*In re Merck & Co. Sec. Litig.*,
432 F.3d 261 (3d Cir. 2005) .................................................................19

*In re MobileMedia Sec. Litig.*,
28 F. Supp.2d 901 (D.N.J. 1998).........................................................12

*In re Sanofi-Aventis Sec. Litig.*,
No. 07-CV-10279 (GBD), 2009 WL 3094957 (S.D.N.Y. Sept. 25,
2009) ...................................................................................................31

*In re Stone & Webster, Inc., Sec. Litig.*,
414 F.3d 187 (1st Cir. 2005)................................................................13

*In re Vivendi Universal, S.A. Sec. Litig.*,
381 F. Supp. 2d 158 (S.D.N.Y. 2003) ..................................................24

*In re Westinghouse Sec. Litig.*,
90 F.3d 696 (3d Cir. 1996) ..................................................................11

ii

*Industriens Pensionsforsikring A/S v. Becton, Dickinson & Co.*,
620 F. Supp. 3d 167 (D.N.J. 2022) ...................................................................30

*Institutional Invs. Grp. v. Avaya, Inc.*,
564 F.3d 242 (3d Cir. 2009) ...............................................................11, 12, 31

*Kelley v. Aerie Pharms., Inc.*,
No. 15-3007, 2016 WL 3437603 (D.N.J. June 20, 2016) ...........................14, 16

*Matrixx Initiatives, Inc. v. Siracusano*,
563 U.S. 27 (2011)..........................................................................9, 10, 11

*Norfolk Cnty. Ret. Sys. v. Ustian*,
No. 07 C 7014, 2009 WL 2386156 (N.D. Ill. July 28, 2009)............................24

*Palladin Partners v. Gaon*,
No. 05-CV-3305 (WJM), 2006 WL 2460650 (D.N.J. Aug. 22,
2006) ...........................................................................................................32

*Roofer's Pension Fund v. Papa*,
No. 16-2805, 2018 WL 3601229 (D.N.J. July 27, 2018) ...........................21, 30

*Steamfitters Loc. 449 Pension Fund v. Alter*,
No. CIV.A. 09-4730, 2011 WL 4528385 (E.D. Pa. Sept. 30, 2011)..................31

*Strougo v. Mallinckrodt Pub. Ltd. Co.*,
No. 20-10100 (MAS) (TJB), 2022 WL 17740482 (D.N.J. Dec. 16,
2022) ...........................................................................................................10

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
551 U.S. 308 (2007)..........................................................................9, 20

*TSC Indus., Inc. v. Northway, Inc.*,
426 U.S. 438 (1976)..........................................................................11

*Walsingham v. Biocontrol Tech., Inc.*,
66 F. Supp. 2d 669 (W.D. Pa. 1998)................................................................15

*Warren Gen. Hosp. v Amgen Inc.*,
643 F.3d 77 (3d Cir. 2011) ..............................................................................9

*Zhengyu He v. China Zenix Auto Int'l Ltd.*,
No. 2:18-15530, 2020 WL 3169506 (D.N.J. June 12, 2020) ...........................10

## **Statutes**

15 U.S.C. §78j(b) ..................................................................................*passim*

15 U.S.C. §78u-4.................................................................................2, 13, 20

## **Rules & Regulations**

17 C.F.R. §240.10b-5.................................................................................10

Fed. R. Civ. P. 12(b)(6)...............................................................................9

Lead Plaintiff Peter Catanese and Plaintiff Michael Morlock (collectively, "Plaintiffs"), individually and on behalf of all other persons similarly situated, respectfully submit this memorandum of law in opposition to Defendants' motion to dismiss the Amended Complaint (DE 29).

## PRELIMINARY STATEMENT[1]

Defendants[2] lied to investors when they stated that the Company, a pre-commercial-stage biopharmaceutical company, had sufficient funds *through the first half of 2024* to achieve various milestones, *including the commercial launch of its lead cancer therapy drug, Motixafortide, for use in stem cell mobilization*, while at the same time advancing other pipeline programs. Defendants lied to investors *as late as September 1, 2022* to pump up the price of BioLineRx ADS[3] and raise at least $15 million in capital so that the Individual Defendants would receive a "*special* bonus" in 2022 that departed from an executive's typical annual compensation. They succeeded. *In mid-September 2022*, the Company disclosed that *it required capital to facilitate the commercial launch of Motixafortide in stem cell mobilization* ("SCM") and entered into a loan of up to $40 million and a direct

---

[1] Emphasis is added to, and internal citations, quotation marks, ellipses and brackets are omitted from, quoted material unless otherwise indicated. Citations to "¶__" refer to paragraphs in the Amended Complaint (DE 29).

[2] "Defendants" are BioLineRx Ltd. (the "Company"), and its Chief Executive Officer ("CEO") Philip Serlin ("Serlin") and Chief Financial Officer ("CFO") Mali Zeevi ("Zeevi"). Serlin and Zeevi are "Individual Defendants".

[3] "ADS" refers to American Depositary Shares.

securities offering in which the Company agreed to sell its ADS to certain institutional investors *at a steep discount of almost 30%* to raise $15 million. On this news, the price of BioLineRx's ADS fell $0.52, or approximately 34%, to close at $1.02 per ADS on September 19, 2022, damaging investors.

Defendants contend that all of the alleged misstatements are forward-looking statements protected by the PSLRA's safe harbor.[4] Defs. Br. at 22-26.[5] However, they are wrong because allegations based on omissions or statements of *existing* facts or circumstances are not forward looking and do not qualify for safe harbor protection. Here, the claim of fraud is that Defendants were lying when they stated that the Company *currently* had access to sufficient funds through the first half of 2024.

And even if the alleged misstatements are found to be forward-looking, which they are not, they would not be protected by the safe harbor because they were not accompanied by meaningful cautionary statements. First, cautionary language cannot be meaningful if it is misleading in light of historical or current facts, as is the case here. Second, the Company's cautionary statements were not meaningful because they were not tailored to the specific forward-looking statements. The

---

[4] The "PSLRA" refers to the Private Securities Reform Act of 1995, 15 U.S.C. §78u-4.

[5] "Defs. Br." refers to Defendants' Memorandum of Law in Support of Their Motion to Dismiss the Amended Complaint (DE 33-1).

cautionary language is applicable to *any* company in the pharmaceutical industry and does not warn investors of the specific risks that Defendants failed to disclose.

Defendants contend that there are no allegations demonstrating that the statements at issue are false or misleading. Defs. Br. at 20-22. But based on Defendants' misstatements *as late as September 1, 2022*, most investors would have believed that the Company would not need additional capital for some reasonable period of time, especially since its last equity financing had taken place during January 2021 resulting in gross proceeds of $34.5 million. But just a few weeks after September 1, 2022, the Company announced that it required significant additional capital to facilitate the commercial launch of Motixafortide in SCM – the same milestone that Defendants previously stated was sufficiently funded, and that the Company was able to raise the capital needed through a loan of up to $40 million and a direct offering of its ADS to certain institutional investors *at a steep discount of almost 30%*.

Defendants also contend that the alleged misstatements were not material in light of the Company's warnings that the Company may need to raise additional capital *in the future*. Defs. Br. at 13-17, 22. But again, notwithstanding these warnings, it was reasonable for investors to assume that the Company would not need additional financing for some reasonable period of time, especially since its last equity financing had taken place during January 2021 resulting in gross proceeds

3

of $34.5 million. Defendants argue that the Company's disclosures render the alleged misrepresentations immaterial. *See* Defs. Br. at 22. But here, the information that should have been disclosed – ***that BioLineRx did not have sufficient funds until the first half of 2024 to achieve certain milestones, including the commercial launch of Motixafortide*** – was not readily and consistently disclosed by Defendants. In fact, it was not disclosed at all.

Additionally, in the Third Circuit, the materiality of alleged misstatements is measured post hoc by looking to the movement of a company's stock in the period immediately following a corrective disclosure. Here, the Company issued a press release on September 19, 2022 disclosing that the Company agreed to sell its ADS in a direct offering to certain institutional investors at a steep discount of almost 30% to raise $15 million to facilitate the commercial launch of Motixafortide. On this news, the price of BioLineRx ADS fell $0.52, or approximately 34%, to close at $1.02 per ADS on September 19, 2022, damaging investors. This decline demonstrates the materiality of the alleged misstatements.

Defendants also argue that Plaintiffs fail to adequately plead scienter. Defs. Br. at 26-31. But when viewed holistically, the allegations suggest a strong inference of scienter. As explained herein, the Individual Defendants benefitted financially from the fraud. They received a special bonus in 2022 for raising $15 million in capital that departed from an executive's typical annual compensation. And CEO

4

Serlin was even more determined to raise capital and receive a special bonus after shareholders failed to approve a proposal in July 2022 regarding his equity compensation.

Additionally, Defendants knew in the summer of 2022 that the Company would likely self-commercialize Motixafortide in SCM. As such, when the Company issued a press release on August 16, 2022 stating that the Company "[e]nded the quarter on solid footing and cash equivalents of $43.2 million, sufficient to fund operations *as currently planned* into the first half of 2024," self-commercialization was already part of those plans. ¶108.

Moreover, the closeness in time of the alleged misstatements and the September 15, 2022 and September 19, 2022 corrective disclosures bolsters Plaintiffs' scienter allegations. Plaintiffs explain, with the assistance of William Purcell, an investment banker with over 50 years of experience, that given the fact that the Company announced on September 15, 2022 that it entered into a major debt transaction, and then, on September 19, 2022, that it entered into a major equity transaction involving a direct equity offering of its ADSs at an approximate discount from current market of almost 30 percent to raise an additional $15 million, it is apparent from an investment banking point of view that Company management most likely began its thought process for such a major financing package a significant period of time, perhaps months, prior to the announcements.

Additionally, the core operations doctrine also supports scienter. Motixafortide in SCM was the Company's lead drug candidate during the Class Period. Analysts routinely focused on Motixafortide in SCM as the main driver behind BioLineRx's value. The success of Motixafortide in SCM was therefore paramount within the Company and essential to each of the Individual Defendants. Thus, Defendants cannot credibly dispute their knowledge that the Company did not have sufficient funds through the first half of 2024 to achieve various milestones, including the commercial launch of Motixafortide in SCM.

Furthermore, four confidential witnesses, who were former employees of the Company, describe Serlin as a very hands-on CEO who stayed involved in day-to-day operations. These allegations add additional weight to the inference of scienter.

For all of these reasons, Plaintiffs adequately plead scienter.

Defendants' sole argument with respect to Plaintiffs' Section 20(a) claim is that because Plaintiffs failed to adequately plead a predicate Section 10(b) violation, Plaintiffs' claim under Section 20(a) should also be dismissed. But because Defendants failed to show that Plaintiffs' Section 10(b) claim should be dismissed, there is no basis to dismiss Plaintiffs' Section 20(a) claim.

## STATEMENT OF FACTS

During the Class Period,[6] BioLineRx was a pre-commercial-stage biopharmaceutical company focused on oncology. The Company touted a promising pipeline. The Company's lead program, Motixafortide, is a cancer therapy platform. Motixafortide works by blocking the interaction between CXCL12 and CXCR4 to mobilize hematopoietic stem cells into the peripheral blood for collection and transplant.

Motixafortide was evaluated in the Company's GENESIS trial, which was a Phase 3 study in SCM for autologous bone-marrow transplantation for patients suffering from multiple myeloma, an incurable blood cancer. In May 2021, the Company announced that the GENESIS study achieved all of its primary and secondary endpoints with a high degree of statistical significance and appeared to be a huge success.

Throughout the Class Period, Defendants misled the market to believe that the Company had sufficient funds through the first half of 2024 to achieve various milestones, including potential FDA approval and the commercial U.S. launch of Motixafortide in SCM, while at the same time advancing other pipeline programs.[7] Defendants' misrepresentations and/or omissions artificially inflated the price of the

---

[6] "Class Period" is February 23, 2021 through September 19, 2022, both dates inclusive.

[7] "FDA" refers to the Food and Drug Administration.

Company's ADS. With a $75 million market cap as of August 25, 2022, $43.2 million cash as of June 30, 2022, and a cash runway until the first half of 2024, the Company appeared to be in sound financial condition.

Yet, by mid-September 2022, the Company disclosed the truth. BioLineRx would require a loan from Kreos Capital VII Aggregator SCSP ("Kreos Capital") in an aggregate principal amount of up to $40 million and a $15 million direct securities offering in which the Company agreed to sell its ADSs to certain institutional investors *at a steep discount of almost 30%* to raise $15 million *to facilitate the commercial launch of Motixafortide in SCM* and for general corporate purposes. On this news, the price of BioLineRx's ADS fell $0.52, or approximately 34%, to close at $1.02 per ADS on September 19, 2022, damaging investors.

**DEFENDANTS' MISSTATEMENTS DURING THE CLASS PERIOD**

Defendants dedicate more than six pages of their brief to setting forth what they contend are the alleged misstatements in the Amended Complaint. Defs. Br. at 7-13. However, because Defendants (i) have not included the September 1, 2022 statements,[8] (ii) have not included Defendant Zeevi's statements during the May 11, 2022 Earnings Call,[9] (iii) have not included some of the statements set forth in the Company's Form 6-K, Ex. 1 filed August 16, 2022,[10] (iv) failed to include Plaintiffs'

---

[8] ¶77.

[9] ¶70.

[10] ¶72.

emphasis on specific sentences within block quotes,[11] and (v) emphasized different language that was not emphasized by Plaintiffs,[12] Plaintiffs direct the Court's attention to a chart, attached as Exhibit A to the accompanying Declaration of Brenda Szydlo ("Szydlo Decl."), which sets forth all of the alleged misstatements *as they appeared in the Amended Complaint* (¶¶46-47, 49-51, 53-55, 57-58, 60-61, 63, 65, 67-70, 72-75, 77).

## ARGUMENT

### I.  STANDARDS GOVERNING MOTIONS TO DISMISS

To survive a motion to dismiss under Rule 12(b)(6), a complaint "need only allege 'enough facts to state a claim to relief that is plausible on its face.'" *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 45 n.12 (2011) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). In ruling on a 12(b)(6) motion, a court must accept all well-pled factual allegations as true, draw all reasonable inferences in plaintiff's favor, and determine whether the plaintiff may be entitled to relief under any reasonable reading of the complaint. *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 320-22 n.4 (2007); *see also Warren Gen. Hosp. v Amgen Inc.*, 643 F.3d 77, 84 (3d Cir. 2011).

To state a Section 10(b) claim, plaintiffs must allege six elements: "(1) a

---

[11] *Compare* Defs. Br. at 7-13 *with* ¶¶46-47, 49-50, 53-55, 57-58, 60-61, 63, 65, 67-69, 73-75.

[12] *Compare* Defs. Br. at 8-13 *with* ¶¶47, 50-51, 54-55, 57-58, 60, 68-69, 73-74.

material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *Matrixx*, 563 U.S. at 37-38; *see also In re Aurora Cannabis, Inc. Sec. Litig.*, No. 19-cv-20588, 2023 WL 5508831, at *4 (D.N.J. Aug. 24, 2023). To state a Section 20(a) claim, plaintiffs must allege facts showing a predicate Section 10(b) violation by the company and circumstances establishing defendant's control over the company's actions. *Zhengyu He v. China Zenix Auto Int'l Ltd.*, No. 2:18-15530 (KM-JAD), 2020 WL 3169506, at *13 (D.N.J. June 12, 2020). "Section 20(a) of the Exchange Act creates a cause of action against individuals who exercise control over a 'controlled person,' including a corporation, that has committed a violation of Section 10(b)." *Strougo v. Mallinckrodt Pub. Ltd. Co.*, No. 20-10100 (MAS) (TJB), 2022 WL 17740482, at *6 (D.N.J. Dec. 16, 2022). "Accordingly, liability under Section 20(a) is derivative of an underlying violation of Section 10(b) by the controlled person." *Id.*

## II.    PLAINTIFFS ADEQUATELY ALLEGE MATERIALLY FALSE AND MISLEADING STATEMENTS

Under Section 10(b) of the Exchange Act[13] and SEC Rule 10b-5 promulgated thereunder,[14] it is unlawful to "make any untrue statement of a material fact or to

---

[13] 15 U.S.C. §78j(b).

[14] 17 C.F.R. §240.10b-5.

omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading." 17 C.F.R. §240.10b-5(b). Information is material if "a *reasonable* investor would have viewed the nondisclosed information as having *significantly* altered the total mix of information made available." *Matrixx*, 563 U.S. at 44 (emphasis in original). "Moreover, 'materiality is a mixed question of law and fact, and the delicate assessments of the inferences a reasonable shareholder would draw from a given set of facts are peculiarly for the trier of fact.' Therefore, 'only if the alleged misrepresentations or omissions are so obviously unimportant to an investor that reasonable minds cannot differ on the question of materiality is it appropriate for the district court to rule that the allegations are inactionable as a matter of law.'" *In re Westinghouse Sec. Litig.*, 90 F.3d 696, 714 (3d Cir. 1996) (quoting *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 450 (1976)).

### A.   The Alleged Misstatements Are Not Protected By the PSLRA's Safe Harbor

Under the PSLRA's safe harbor provision, a defendant is not liable for a forward-looking statement if (i) it is identified as a forward-looking statement and is accompanied by meaningful cautionary language; (ii) it is immaterial; or (iii) plaintiff fails to show the statement was made with actual knowledge of its falsehood. *Institutional Invs. Grp. v. Avaya, Inc.*, 564 F.3d 242, 254 (3d Cir. 2009). When defendants make mixed statements containing non-forward-looking

11

statements as well as forward-looking statements, the non-forward-looking statements are not protected by the safe harbor. *Id.* at 255; *In re Eros Int'l PLC Sec. Litig.*, No. 19-14125, 2021 WL 1560728, at *7 (D.N.J. Apr. 20, 2021).

### i.    The Alleged Misstatements Are Not Forward Looking

Defendants contend that all of the alleged misstatements are forward-looking statements protected by the safe harbor.  Defs. Br. at 22-26. However, they are wrong because allegations based on omissions or statements of existing facts or circumstances are not forward looking and do not qualify for safe harbor protection. *See Carmignac Gestion, S.A. v. Perrigo Co. PLC*, No. 17-10467, 2019 WL 3451523, at *11 (D.N.J. July 31, 2019) ("Although some of these statements are prefaced with forward-looking language and may be construed as projecting future drug-pricing strategies," the statements are not "forward-looking statements for safe harbor purposes because they omit existing facts that bear on the pricing strategy projections"); *In re Majesco Sec. Litig.*, No. 05-cv-3557 (PGS), 2006 WL 2846281, at *4 (D.N.J. Sept. 29, 2006) ("Courts have held that allegations based upon omissions of existing facts or circumstances" are not forward-looking and protected by the safe harbor); *In re MobileMedia Sec. Litig.*, 28 F. Supp.2d 901, 930 (D.N.J. 1998) ("Allegations based upon omissions of existing facts or circumstances do not constitute forward looking statements . . . .").

The present case is analogous to *In re Stone & Webster, Inc., Sec. Litig.*, 414 F.3d 187 (1st Cir. 2005). In that case, the statement in question was "essentially that the Company 'has on hand . . . sufficient sources of funds to meet its anticipated [needs].'" *Id.* at 212 (alterations in original). The First Circuit stated:

> The part of the statement that speaks of the quantity of cash on hand speaks of a present fact…. The claim of fraud . . . does not involve a contention that the defendants were underestimating the amount of their future cash needs. The claim is rather that the defendants were lying about the Company's present access to funds….
>
> The mere fact that a statement contains some reference to a projection of future events cannot sensibly bring the statement within the safe harbor if the allegation of falsehood relates to non-forward-looking aspects of the statement….
>
> In this case, the alleged falsehood was in the fact that the statement claimed that the Company had access to ample cash at a time when the Company was suffering a dire cash shortage. The claim was not that the Company was understating its future cash needs. In our view, the safe harbor of the PSLRA does not confer a *carte blanche* to lie in such representations of current fact.

*Id.* at 212-13.

Here, as in *In re Stone & Webster*, Plaintiffs alleged that despite telling investors throughout the Class Period *and as late as September 1, 2022*, that the Company *currently* had sufficient cash on hand *through the first half of 2024* to execute its strategy to develop Motixafortide in SCM while at the same time advancing other pipeline programs, Defendants failed to disclose that the Company actually did not have enough funds and would need significant additional funding *in*

13

*September 2022* in order to fund its operations and pipeline programs. Defendants' statements are not protected by the safe harbor because the claim of fraud does not involve a contention that Defendants were underestimating the amount of their future cash needs. The claim is rather that Defendants were lying when they stated that the Company currently had access to sufficient funds through the first half of 2024.

For these reasons, the alleged misstatements are not forward-looking.

### ii.    BioLineRx's Cautionary Statements Were Inadequate

Even if the alleged misstatements are found to be forward-looking, which they are not, they would not be protected by the safe harbor because they were not accompanied by meaningful cautionary statements. To qualify for the safe harbor, the relevant cautionary language must be "extensive[,]" "substantive and tailored" to the specific forward-looking statement which the plaintiff challenges. *GSC Partners CDO Fund v. Washington*, 368 F.3d 228, 243 n.3 (3d Cir. 2004). "Mere boilerplate disclaimers that warn generally of risks are insufficient . . . ." *Kelley v. Aerie Pharms., Inc.*, No. 15-3007, 2016 WL 3437603, at *4 (D.N.J. June 20, 2016) (citing *GSC Partners*, 368 F.3d at 243 n.3); *see also Perrigo*, 2019 WL 3451523, at *12 (finding disclosures "too general to warrant safe harbor protection" and "fail to meet the extensive and specific requirement").

In this case, the cautionary language is not meaningful for two reasons. First,

14

cautionary language cannot be meaningful if it is misleading in light of historical or current facts, as here. *See In re: Enzymotec Sec. Litig.*, No. 14-5556 (JLL) (MAH), 2015 WL 8784065, at *11 (D.N.J. Dec. 15, 2015) (finding cautionary language not meaningful where lead plaintiffs alleged that risks had already come to pass); *see also In re Harman Int'l Indus., Inc. Sec. Litig.*, 791 F.3d 90, 102 (D.C. Cir. 2015) (stating "cautionary language cannot be meaningful if it is misleading in light of historical facts" or information "that w[as] established at the time the statement was made"); *Walsingham v. Biocontrol Tech., Inc.*, 66 F. Supp. 2d 669, 679 (W.D. Pa. 1998) (holding cautionary language insufficient where plaintiff's claims were "based upon allegation of misrepresented historical or current facts").

Here, Defendants direct the Court's attention to cautionary language ***issued on August 16, 2022***. *See*, *e.g.*, Defs. Br. at 15, 17; Declaration of Jason H. Kislin, dated Sept. 5, 2023 ("Kislin Decl."). Ex. L (Aug. 16, 2022 Operating and Financial Review) at 14 ("Until we can generate significant continuing revenues, we expect to satisfy our future cash needs through . . . debt or equity financings. . . ."); *id.* at 13-14 ("Although we believe our existing cash and other resources will be sufficient to fund our current cash requirements into the first half of 2024, we will require additional financing in the future. . . ."); Kislin Decl. Ex. K (Aug. 16, 2022 Condensed Consolidated Interim Financial Statements) at F-7 ("Management believes that the Company's current cash and other resources will be sufficient to

15

fund its projected cash requirements into the first half of 2024. However, in the event the Company does not begin to generate sustainable cash flows from its operating activities in the future, the Company will need to . . . raise additional funding."). But the Amended Complaint explains, "with the assistance of William Purcell, an investment banker with over 50 years of experience . . . that Company management most likely began its thought process with respect to the Kreos Capital loan and the Direct Offering *a significant period of time, perhaps months, prior to the September 15, 2022 and September 19, 2022 announcements*" ¶¶110-16.

Second, the cautionary language relied on by Defendants was not meaningful because it was *not* tailored to the specific forward-looking statements. Much of the cautionary language is applicable to *any* company in the pharmaceutical industry and does not warn investors of the specific risks that Defendants failed to disclose. As such, the cautionary statements are inadequate to protect Defendants. *See Aerie Pharms.*, 2016 WL 3437603, at *4 ("[B]oilerplate disclaimers that warn generally of risks are insufficient . . . ."); *see, e.g.,* Defs. Br. at 16 ("The cost of clinical trials may vary significantly over the life of a project as a result of differences arising during clinical development . . . ."); *id.* at 16-17 ("The lengthy process of completing clinical trials and seeking regulatory approval for our product candidates requires expenditure of substantial resources. Any failure or delay in completing clinical trials, or in obtaining regulatory approvals, could cause a delay in generating product

revenue and cause our research and development expenses to increase and . . . have a material adverse effect on our operations."); *id.* at 15 ("The lengthy process of completing clinical trials and seeking regulatory approval for candidates requires expenditures of substantial resources. Any failure or delay in completing clinical trials, or in obtaining regulatory approvals, could cause a delay in generating revenue and cause our research and development expenses to increase and . . . have a material adverse effect on our operations."); *id.* ("Due to the inherently unpredictable nature of preclinical and clinical development processes, we are unable to estimate with any certainty the costs we will incur in the continued development of the therapeutic candidates in our pipeline for potential commercialization.").

**B.      The Alleged Misstatements Are Materially False and/or Misleading**

Defendants contend that "there are no allegations demonstrating that the statements at issue are false or misleading[,]" but they are wrong. Defs. Br. at 21. Plaintiffs sufficiently allege that Defendants stated ***as late as September 1, 2022*** that the Company ***currently had sufficient funds through the first half of 2024*** to achieve various milestones, ***including potential FDA approval and the commercial launch of the drug***. ¶¶37-40, 77-78. As a result, during the Class Period, most investors would have believed that the Company would not need additional financing for some reasonable period of time, especially since its last equity financing had taken place during January 2021 resulting in gross proceeds of $34.5

17

million. ¶95. But just a few weeks later, the truth was disclosed. ***In mid-September 2022***, the Company announced that it required additional funding ***to facilitate the commercial launch of Motixafortide*** in SCM, and had entered into a $40 million debt financing agreement, and a direct offering of ADS to certain institutional investors ***at a steep discount of almost 30%*** to raise $15 million. ¶¶10, 40, 79-84.

Defendants also contend that the alleged misstatements were not material in light of the Company's warnings that the Company may need to raise additional capital ***in the future***. Defs. Br. at 13-17, 22. Again, notwithstanding these warnings, it was reasonable for investors to assume that the Company would not need additional financing for some reasonable period of time, especially since its last equity financing had taken place during January 2021 resulting in gross proceeds of $34.5 million. ¶95. Defendants rely on *Anderson v. StoneMor Partners, L.P.*, 296 F. Supp. 3d 693, 703 (E.D. Pa. 2017) to support their argument that the alleged misstatements were not material because of these disclosures. Defs. Br. at 22. But *StoneMor*, which was affirmed by the Third Circuit in *Fan v. StoneMor Partners, LP*, 927 F.3d 710 (3d Cir. 2019), "simply reaffirms the well-established rule that, in a securities fraud case, a defendant's *sufficient* disclosure of information can render alleged misrepresentations immaterial." *Id.* at 718. Here, the information that Plaintiffs claim should have been disclosed – ***that Defendants did not have sufficient capital until the first half of 2024 to achieve certain milestones,***

18

***including the commercial launch of Motixafortide*** – was not "readily and consistently disclosed" by Defendants as it was in *StoneMor*. *See id.* at 716. In fact, it was not disclosed at all.

Additionally, in *In re Merck & Co. Sec. Litig.*, 432 F.3d 261, 269 (3d Cir. 2005), the court explained that in the Third Circuit, the materiality of alleged misstatements may be measured post hoc by looking to the movement, in the period immediately following a corrective disclosure, of the price of the company's stock. In this case, the Company's issued a press release on September 19, 2022 disclosing that the Company agreed to sell its ADSs in a direct offering to certain institutional investors *at a steep discount of almost 30%* to raise $15 million to facilitate the commercial launch of Motixafortide in SCM. On this news, the price of BioLineRx's ADSs fell $0.52, or approximately 34%, to close at $1.02 per ADS on September 19, 2022, damaging investors. This decline demonstrates the materiality of the alleged misstatements. ¶¶82-84.[15]

---

[15] Should Defendants contend in their reply that the FDA's approval of Motixafortide subsequent to the filing of their motion to dismiss has some bearing on whether Defendants made a materially false or misleading statement, such argument carries no weight for it is well-established that a subsequent approval or denial by the FDA has no bearing on the alleged misstatements during the Class Period. *See Alberici v. Recro Pharma, Inc.*, No. CV 18-2279, 2021 WL 798299, at *7-8 (E.D. Pa. Mar. 1, 2021).

III.   **WHEN VIEWED HOLISTICALLY, THE ALLEGATIONS IN THE AMENDED COMPLAINT SUGGEST A STRONG INFERENCE OF SCIENTER**

The PSLRA requires plaintiffs to "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2). A "strong inference" of scienter arises "[w]hen the allegations are accepted as true and taken collectively," a "reasonable person would deem the inference of scienter . . . at least as compelling as any opposing inference one could draw from the facts alleged." *Tellabs*, 551 U.S. at 324. The inference "need not be irrefutable, *i.e.*, of the smoking gun genre, or even the most plausible of competing inferences." *Id.* at 324. In evaluating the strength of an inference of scienter, "courts must consider the complaint in its entirety" because the "inquiry … is whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Id.* at 322-23 (emphasis in original). Moreover, at the motion to dismiss stage, a tie on scienter goes to the plaintiff. *Biondolillo v. Roche Holding AG*, No. 17-4056, 2018 WL 4562464, at *4 (D.N.J. Sept. 24, 2018) (plaintiff's "inference need only be *as* compelling, not *more* compelling, than a competing inference") (emphasis in original).

To establish a strong inference of scienter, Plaintiffs must allege facts showing circumstantial evidence of either reckless or conscious behavior, which may be

20

bolstered, but not shown solely, by allegations of motive and opportunity. *Roofer's Pension Fund v. Papa*, No. 16-2805, 2018 WL 3601229, at *15, 17 (D.N.J. July 27, 2018). In the securities context, "[r]ecklessness is an extreme departure from the standards of ordinary care, which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it." *In re Cancer Genetics, Inc. Sec. Litig.*, No. 2:18-CV-05612-ES-SCM, 2020 WL 3276740, at *3 (D.N.J. Feb. 26, 2020).

### A.    The Individual Defendants Benefitted Financially from the Fraud

The Company's Compensation Policy explains that the Individual Defendants could receive a *special* bonus on the occurrence of significant events, such as completing a substantial funding event of *not less than $15 million.* The Individual Defendants' special bonus was each capped at up to four months of salary. ¶¶86-89.

In addition to a special bonus, success in raising capital was considered a measurable personal objective and one of the performance metrics considered for purposes of an executive's annual bonus. Meeting measurable personal objectives, which included success in raising capital, was assigned a weight of 15% to 25% for purposes of determining an executive's annual bonus. Serlin and Zeevi's annual bonuses were capped at eight months of salary and six months of salary, respectively. ¶90.

In January 2021, prior to the Class Period, the Company raised capital by

selling 14,375,000 ADSs in a public offering resulting in gross proceeds of $34.5 million. ¶95. As a result, in January 2021, Serlin and Zeevi became eligible for their maximum special bonuses *for the entire year* totaling four months of salary or $96,666 and $62,000, respectively. Serlin's total compensation for 2021 was $904,000 – including $251,000 in total special and annual bonuses, which had been capped at $289,999 for that year. Zeevi's total compensation for 2021 was $458,000 – including $135,000 in total special and annual bonuses, which had been capped at $155,000 for that year. As per the Compensation Policy, *Serlin and Zeevi both knew that if they raised another $15 million in capital in 2021, they would not be eligible for another large special bonus that year because of the cap*. *See* ¶¶86-87, 95-98. As such, they were no longer incentivized to raise further capital in 2021 even though the Company admittedly needed substantial additional funds to commercialize Motixafortide in SCM. Instead, the special bonus policy provided an incentive for Serlin and Zeevi to mislead the market to believe the Company had sufficient cash for years to come to execute its strategy for Motixafortide in SCM, while at the same time advancing other pipeline programs. *See* ¶¶39, 45, 86-87, 95-99.

With a $75 million market cap as of August 25, 2022, $43.2 million in cash as of June 30, 2022, and a cash runway until the first half of 2024, the Company appeared to be in sound financial condition. Defendants' omissions and continuous touting, as late as September 1, 2022, pumped up the price of the Company's ADS

22

which helped to raise capital via the Kreos Capital Loan and the $15 million Direct Offering disclosed in mid-September 2022.[16] The Individual Defendants received large bonuses in 2022 as a result of the $15 million Direct Offering, which included additional special bonuses that the Individual Defendants would not have been eligible to receive had Defendants raised the $15 million in capital in 2021. ¶¶39, 99.

For 2022, Serlin and Zeevi were eligible for a special bonus of up to $99,000 and $64,333, respectively, for raising $15 million in capital via the Direct Offering. In 2022, Serlin's total compensation was $1.36 million, including $238,000 in total special and annual bonuses; and Zeevi's total compensation was $482,00, including $122,000 in total special and annual bonuses. ¶¶91-94.

Defendants contend that "a desire to earn incentive-based compensation does not create a proper inference of scienter." Defs. Br. at 27. But here, the *special* bonus

---

[16] Companies benefit from a higher stock price when raising capital and an increase in a company's share price implies a lower cost of capital being priced in by the market. *See Why Do Companies Care About Their Stock Price?*, Finances Time (updated July 28, 2023), https://financestime.com/blog/why-do-companies-care-about-their-stock-price/#:~:text=Key%20Takeaways%3A-,1.,and%20borrow%20money%20from%20banks; *How Your Stock Price Can Affect Your Company's Operations (And Not Just Your Shareholders)*, Irwin, https://www.getirwin.com/blog/how-your-stock-price-can-affect-your-companys-operations-and-not-just-your-shareholders#:~:text=competitive%20advantage%2Fdisadvantage.-,Implications%20for%20your%20cost%20of%20capital,priced%20in%20by%20the%20market (last visited Nov. 1, 2023).

is distinct from the run-of-the-mill corporate incentive because it was specifically pegged to the occurrence of significant events, one of which was completing a substantial funding event of *not less than $15 million*, rather than to BioLineRx's general success. ¶86; Szydlo Decl. Ex. B (BioLineRx Form 6-K, filed with the SEC May 27, 2022, Ex. 1, Annex A (Compensation Policy)) at A-15. *See*, *e.g.*, *In re Celgene Corp. Sec. Litig.*, No. 18-4772, 2019 WL 6909463, at *21 (D.N.J. Dec. 19, 2019) (holding that plaintiff's allegations that defendants' received a performance award and/or bonus resulting, in part, from the filing of a new drug application were "additional facts [that] demonstrate that Smith and Martin also had a personal financial motivation to push for the NDA filing to occur"); *Frater v. Hemispherx Biopharma, Inc.*, 996 F. Supp. 2d 335, 350 (E.D. Pa. 2014) (finding plaintiffs adequately alleged that "change of control bonus provision gave [president and chairman] personal incentives relating to a stock sale in a way that departs from executives' typical compensation incentives"); *In re Vivendi Universal, S.A. Sec. Litig.*, 381 F. Supp. 2d 158, 185 (S.D.N.Y. 2003) (finding plaintiffs sufficiently alleged CEO and Vivendi had motive for inflating appearance of Vivendi's financial performance where CEO received large bonus for boosting Vivendi's EBITDA by more than 30%).[17]

---

[17] *See also Norfolk Cnty. Ret. Sys. v. Ustian*, No. 07 C 7014, 2009 WL 2386156, at *10 (N.D. Ill. July 28, 2009) (finding Defendants' bonus, "coupled with professional motives to hide internal weaknesses and paint a rosy picture of the restructuring[,]

And because the Individual Defendants' special bonus was tied to their misstatements (which pumped up the price of the Company's ADS and helped to raise additional capital via the $15 million Direct Offering), that fact also bolsters scienter. *Frank v. Dana Corp.*, 646 F.3d 954, 960, 962 (6th Cir. 2011) (finding that where a bonus is directly tied to the alleged misstatement promoted by the executive, that fact also bolsters scienter).

**B.     Serlin Was Even More Determined to Raise Capital and Receive a Special Bonus after Shareholders Failed to Approve a Proposal in July 2022 Regarding His Equity Compensation**

Serlin was even more determined to raise capital and receive a special bonus after shareholders failed to approve a proposal regarding his equity compensation in July 2022. ¶100. In May 2022, the Company's Compensation Committee and the Board of Directors approved the grant to Serlin of options to purchase 4,194,800 Ordinary Shares (equivalent to 279,653 ADS) and 3,073,600 Performance Stock Units (equivalent to 204,907 ADS). ¶101. Pursuant to Israel Companies Law, arrangements regarding the compensation of the Company's CEO require the approval of the Compensation Committee, the Board of Directors and the shareholders, in that order. ¶102. However, shareholders who participated in the

---

lend weight to [a compelling inference of scienter]"); *In re Lattice Semiconductor Corp. Sec. Litig.*, No. CV04-1255-AA, 2006 WL 538756, at *19 (D. Or. Jan. 3, 2006) (finding defendants' motive to keep the stock price high, raise capital and maximize their bonuses adds additional weight to the inference of scienter).

25

Annual General Meeting of Shareholders held on July 3, 2022, failed to approve the proposed equity compensation to Serlin. ¶103.

### C.    Defendants Knew in the Summer of 2022 That the Company Would Likely Self-Commercialize Motixafortide in SCM

Eight days after BioLineRx's ADS dropped approximately 34% as a result of the Company's mid-September 2022 corrective disclosures, BioLineRx filed a Form 6-K with the SEC on September 27, 2022, signed by Defendant Serlin, along with a press release. The September 27, 2022 press release states, in relevant part, that, if the FDA approves Motixafortide, the Company intends to commercialize the drug in the U.S. independently in order to accelerate its availability to patients and maximize the value of the drug. "To support a robust commercial launch, the Company will employ a small and targeted sales force to support outreach to this well-defined community." But having just submitted its New Drug Application to the FDA for Motixafortide in SCM five days earlier on September 12, 2022, Defendants admittedly knew that potential FDA approval would not be granted until some point in 2023. (On November 10, 2022, the Company announced the FDA's acceptance of the NDA for APHEXDA (Motixafortide) and a target action date of September 9, 2023.). ¶¶104-05.

During the Class Period, the Company stated that it continued to maintain "full optionality" among a number of commercialization alternatives, and one of those alternatives was commercializing the drug in the U.S. independently, which,

26

according to the Company, would only require a limited commercialization footprint due to a very concentrated end market, where approximately 80 transplant centers in the U.S. conduct the vast majority of stem cell transplant procedures. With these "commercialization alternatives" and the need for a "limited commercialization footprint," investors had every reason to believe Defendants' statements that the Company had sufficient capital to fund operations into the first half of 2024 *even if the Company decided to independently commercialize the drug*. ¶¶106-07.

Additionally, an October 18, 2022 article entitled "Fire Phil Serlin," reported that Holly May, who served as the Company's Chief Commercial Officer from June 2022 to September 2022,[18] stated at a September 28, 2022 Investor and Key Opinion Leader Webinar presentation that in her early days at BioLineRx – arguably June/July 2022 since Ms. May was at the Company for only four months prior to the presentation – the Company had conducted a deep analysis of the commercialization options and self-commercialization was a much more attractive option from a cost perspective. *In other words, Defendants knew in the summer of 2022 that the Company would likely self-commercialize Motixafortide in SCM.* For this reason, when the Company issued a press release on August 16, 2022 stating that the Company "[e]nded the second quarter on solid footing and cash equivalents of $43.2

---

[18] Holly May continues to serve as BioLineRx USA's President since September 2022.

27

million, sufficient to fund operations, *as currently planned*, into the first half of 2024," self-commercialization was already part of those plans. ¶108.

**D.    The Timing between the Alleged Misstatements and the Corrective Disclosures Suggest That Defendants Knew or Should Have Known Their Statements Were False and/or Misleading**

The closeness in time of the alleged false and/or misleading statements and the September 15, 2022 and September 19, 2022 corrective disclosures bolsters Plaintiffs' scienter allegations. Plaintiffs explain, with the assistance of William Purcell, an investment banker with over 50 years of experience, that given the fact that the Company announced on September 15, 2022 that it had entered into a major debt transaction, and then, on September 19, 2022, that it had entered into a major equity transaction involving a direct equity offering of its ADSs at an approximate discount from current market of almost 30 percent to raise an additional $15 million, it is apparent from an investment banking point of view that Company management most likely began its thought process for such a major financing package a significant period of time, perhaps months, prior to the announcements. ¶¶110, 113. Any private placement securities transaction, given the disclosure requirements of the U.S. securities laws as well as the extensive due diligence generally needed by potential investors in regard to a non-seasoned company, would generally take a significant amount of time from start to completion. ¶114.

Generally, a team of senior Company management, its counsel knowledgeable in financing transactions, and an investment bank placement agent would be retained with engagement agreements negotiated. A detailed Offering Memorandum would generally need to be prepared for potential investors to study. These potential investors (in this matter both potential debt and equity investors) would generally undertake significant due diligence in meeting with senior management and key Company employees, would ask numerous detailed and probing questions, and often request additional documents and information from the Company – and often even retaining an outside expert in the area of the Company's expertise to confirm certain data and potential prospects of the Company's products. Finally, tedious negotiations often are required in connection with the language and representations pertaining to the finalized financing documents, especially in regard to transactions involving debt and equity from different parties each attempting to best protect its own interests. This task alone can take weeks before a closing can take place. ¶115. All of the above steps would generally be time consuming, perhaps covering months. This conclusion would be compounded perhaps by the additional negotiations needed to get the Company to agree to a discount relating to its equity securities of as much as 30 percent. ¶116.

**E.     Core Operations**

The core operations doctrine also supports scienter.  Although a court may not

29

infer that a corporate officer "was aware of information merely by virtue of his or her position within a company, where the information relates to the organization's core business, such facts are powerful circumstantial evidence of scienter." *Roofer's Pension Fund*, 2018 WL 3601229, at *24; *see also Industriens Pensionsforsikring A/S v. Becton, Dickinson & Co.*, 620 F. Supp. 3d 167, 196-97 (D.N.J. 2022) ("[T]he core operations doctrine serves as another piece of the [scienter] puzzle . . . .").

Motixafortide in SCM was the Company's lead drug candidate during the Class Period. Analysts routinely focused on Motixafortide in SCM as the main driver behind BioLineRx's value. For example, on May 5, 2021, H.C. Wainwright & Co. described Motixafortide as the Company's lead asset and basis for valuing BLRX shares. The success of Motixafortide in SCM was therefore paramount within the Company and essential to each of the Individual Defendants. Thus, Defendants cannot credibly dispute their knowledge that the Company did not have sufficient funds through the first half of 2024 to achieve various milestones, *including the commercial launch of Motixafortide in SCM*. ¶¶126-28. By mid-September 2022, just a few weeks after representing that it had enough cash until the first half of 2024, BioLineRx announced it would require debt and equity financing *to facilitate the commercial launch of the drug*. ¶¶79-82.

### F.    Serlin Was Very Hands-On and Involved in Day-To-Day Operations

Additionally, four confidential witnesses, who were former employees of the

Company, describe Serlin as a very hands-on CEO who stayed involved in day-to-day operations. *See* ¶¶117-25.[19] These allegations add additional weight to the inference of scienter. *See Allegheny Cnty. Emps.' Ret. Sys. v. Energy Transfer LP*, 532 F. Supp. 3d 189, 228 (E.D. Pa. 2021) ("[P]laintiffs can use circumstantial evidence to allege scienter, including the importance of a particular matter to the business, meetings and conversations the individual was alleged to be part of, and the day-to-day responsibilities of that individual."); *Steamfitters Loc. 449 Pension Fund v. Alter*, No. CIV.A. 09-4730, 2011 WL 4528385, at *9 (E.D. Pa. Sept. 30, 2011) ("insider reports that Alter and Rosoff were 'hands-on' executives" were among the factors considered in finding that Plaintiff sufficiently alleged scienter).[20]

## IV.    PLAINTIFFS STATE A CLAIM UNDER SECTION 20(a)

Defendants' sole argument with respect to Plaintiffs' Section 20(a) claim is that because Plaintiffs failed to adequately plead a predicate Section 10(b) violation, Plaintiffs' claim under Section 20(a) should also be dismissed. Defs. Br. at 31. But because Defendants failed to show that Plaintiffs' Section 10(b) claim should be

---

[19] The Amended Complaint adequately describes the confidential witnesses' positions and the basis of their personal knowledge, as required in *Avaya*, 564 F.3d at 263. *See* ¶¶117-25.

[20] Should Defendants argue in their reply that the FDA's approval of Motixafortide *after* the filing of their motion to dismiss is relevant because it somehow negates Defendants' scienter, such argument carries no weight because the subsequent approval or denial by the FDA has no bearing on Defendants' scienter during the Class Period. *See, e.g., In re Sanofi-Aventis Sec. Litig.*, No. 07-CV-10279 (GBD), 2009 WL 3094957, at *7 (S.D.N.Y. Sept. 25, 2009).

dismissed, there is no basis to dismiss Plaintiffs' Section 20(a) claim. *Palladin Partners v. Gaon*, No. 05-CV-3305 (WJM), 2006 WL 2460650, at \*15 (D.N.J. Aug. 22, 2006).

## CONCLUSION

For all the above reasons, Defendants' motion to dismiss should be denied in its entirety.[21]

Dated: November 6, 2023

Respectfully submitted,

**POMERANTZ LLP**

 /s/ Thomas H. Przybylowski
   Thomas H. Przybylowski

Jeremy A. Lieberman (admitted *pro hac vice*)
Brenda Szydlo (admitted *pro hac vice*)
Dean P. Ferrogari (admitted *pro hac vice*)
600 Third Avenue, 20th Floor
New York, New York 10016
Telephone: (212) 661-1100
Facsimile: (917) 463-1044
jalieberman@pomlaw.com
bszydlo@pomlaw.com
tprzybylowski@pomlaw.com
dferrogari@pomlaw.com

---

[21] If the Court finds that the Amended Complaint contains pleading deficiencies, Plaintiffs request leave to amend which shall be freely given. "Leave should be granted absent a showing of undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, [or] undue prejudice to the opposing party by virtue of the allowance of the amendment, futility of amendments, etc." *See Cal. Pub. Emps.' Ret. Sys. v. Chubb Corp.*, No. 00-4285(GEB), 2002 WL 33934282, at \*32 (D.N.J. June 26, 2002). None of these reasons for denial is presented in the instant case.

*Lead Counsel for Plaintiffs and the Proposed Class*

**BRONSTEIN, GEWIRTZ & GROSSMAN, LLC**
Peretz Bronstein
60 East 42nd Street, Suite 4600
New York, New York 10165
Telephone: (212) 697-6484
Facsimile: (212) 697-7296
peretz@bgandg.com

*Additional Counsel to Lead Plaintiff Peter Catanese*

# CERTIFICATION OF SERVICE

I hereby certify that on this day, I caused Plaintiffs' Memorandum of Law in Opposition to Defendants' Motion to Dismiss the Amended Complaint and the accompanying Declaration of Brenda Szydlo to be electronically filed with the Clerk of the Court and served on all counsel of record using the CM/ECF system.


Dated: November 6, 2023          By: */s/ Thomas Przybylowski*
                                         Thomas Przybylowski