<u>**NOT FOR PUBLICATION**</u>

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY**

| | |
|---|---|
| IN RE BIOLINERX LTD. SECURITIES LITIGATION | Case No. 2:23-cv-00041 (BRM) (JBC) <br><br> **OPINION** |

**MARTINOTTI, DISTRICT JUDGE**

Before the Court is a Motion to Dismiss pursuant to Federal Rules of Civil Procedure 8(a), 9(b), and 12(b)(6) filed by Defendants Philip Serlin ("Serlin"), Mali Zeevi ("Zeevi," and collectively with Serlin, the "Individual Defendants"), and BioLineRx Ltd. ("BioLineRx") (collectively, "Defendants"). (ECF No. 33.) Lead Plaintiff Peter Catanese ("Catanese") and Plaintiff Michael Morlock ("Morlock"), individually and on behalf of all other persons similarly situated (collectively, "Plaintiffs") filed an Opposition (ECF No. 37), and Defendants filed a Reply (ECF No. 38). Having reviewed the submissions filed in connection with Defendants' Motion and having declined to hold oral argument pursuant to Federal Rule of Civil Procedure 78(b), for the reasons set forth below and for good cause having been shown, Defendants' Motion to Dismiss (ECF No. 33) is **GRANTED**.

## I.   BACKGROUND[1]

### A.   Factual Background

For the purpose of this Motion to Dismiss, the Court accepts the factual allegations in the Amended Complaint as true and draws all inferences in the light most favorable to Plaintiffs. *See*

---

[1] The factual background is taken from the allegations in the Amended Complaint ("FAC") (ECF No. 29), as well as the exhibits Defendants submitted in support of their Motion (*see* ECF No. 33-3). The Court considers these exhibits in deciding Defendants' Motion because Plaintiffs' claims rely on these documents (*see* ECF No. 29) and because Plaintiffs do not appear to object to the Court considering these documents (*see* ECF No. 37). Courts can consider any "document *integral*

*Phillips v. Cnty. of Allegheny*, 515 F.3d 224, 228 (3d Cir. 2008). The Court may also consider any "document *integral to or explicitly relied* upon in the complaint." *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1426 (3d Cir. 1997) (quoting *Shaw v. Digit. Equip. Corp.*, 82 F.3d 1194, 1220 (1st Cir. 1996)).

This action is a putative class action arising out of alleged violations of the federal securities laws—specifically Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder. (*See generally* ECF No. 29 (Am. Compl.).) BioLineRx is a biopharmaceutical company headquartered in Israel that focuses on oncology. (*Id.* ¶ 18.) BioLineRx's American Depositary Shares ("ADS") are listed on NASDAQ under ticker symbol BLRX. (*Id.*) Serlin is Chief Executive Officer ("CEO") of BioLineRx. (*Id.* ¶ 19.) Zeevi is the Chief Financial Officer ("CFO") of BioLineRx. (*Id.* ¶ 20.) Plaintiffs are putative class members consisting of all persons, excluding Defendants, who purchased or otherwise acquired BioLineRx ADS between February 23, 2021 and September 19, 2022 (the "Class Period") and who suffered damages as a result of Defendants' alleged conduct. (*Id.* ¶¶ 1, 131.) Catanese and Morlock are persons who purchased BioLineRx ADS at allegedly artificially inflated prices during the Class Period and suffered damages as a result. (*Id.* ¶¶ 16–17.)

BioLineRx's primary product is Motixafortide, which is a stem cell treatment used to treat patients suffering from multiple myeloma, a blood cancer. (*Id.* ¶¶ 3–4.) Motixafortide was being

---

to or explicitly relied* upon in the complaint." *In re Burlington*, 114 F.3d at 1426 (citation omitted). A district court may also consider any "undisputedly authentic document that a defendant attaches as an exhibit to a motion to dismiss if the plaintiff's claims are based on the document." *Pension Benefit Guar. Corp. v. White Consol. Indus., Inc.*, 998 F.2d 1192, 1196 (3d Cir. 1993) (citations omitted). *See also Aliano v. Twp. of Maplewood*, Civ. A. No. 22-05598, 2023 WL 4398493, at *3 (D.N.J. July 7, 2023) ("Documents attached by a defendant to a motion to dismiss are considered part of the pleadings if they are referred to in the plaintiff's complaint and are central to the claim." (citing *Cooper v. Samsung Elecs. Am., Inc.*, 374 F. App'x 250, 253 n.3 (3d Cir. 2010)).

evaluated in BioLineRx's GENESIS trial for the treatment of multiple myeloma. (*Id.* ¶ 4.) BioLineRx's GENESIS trial was a Phase 3 study in stem cell mobilization ("SCM") that evaluated the safety, efficacy, and tolerability of Motixafortide and granulocyte colony-stimulating factor ("G-CSF") for mobilizing "hematopoietic stem-cells for autologous transplantation in multiple myeloma patients." (*Id.* ¶¶ 28–29.) Motixafortide is also being evaluated in studies for treating pancreatic cancer. (*Id.* ¶ 6.) BioLineRx's Phase 2a study evaluated Motixafortide for treating pancreatic cancer and for being a first-line pancreatic cancer therapy. (*Id.* ¶ 35.) Separately, BioLineRx is also developing another oncology program, "AGI–134, an immunotherapy treatment for multiple solid tumors," which was being evaluated in a "Phase 1/2a study." (*Id.* ¶ 36.)

In January 2021, BioLineRx raised capital by selling $14,375,000 ADS at $2.40 per share in a public offering, resulting in gross proceeds totaling $34.5 million. (*Id.* ¶ 43.) In mid-February 2021, Defendants told investors that they believed BioLineRx "had sufficient funds to meet its capital requirements into the second half of 2023." (*Id.* ¶ 38.) For example, on February 23, 2021, BioLineRx filed a Form 20-F with the SEC, which was signed by Serlin and states in part:

> We cannot assure investors that our existing cash and investment balances will be sufficient to meet our future capital requirements.
>
> As of December 31, 2020, we held cash and short-term investments of $22.6 million. In January 2021, we raised net proceeds of $31.4 million in an underwritten public offering and, in January and February 2021, we received another $9.8 million in gross proceeds from the exercise of outstanding warrants. Based on our current projected cash requirements, we believe that our existing cash and investment balances and other sources of liquidity, not including potential milestone and royalty payments under our existing out-licensing and other collaboration agreements, will be sufficient to meet our capital requirements into the second half of 2023. . . .
>
> Developing drugs, conducting clinical trials and commercializing products is expensive and we will need to raise substantial additional funds to achieve our strategic objectives. Although we believe our existing cash and other resources will be sufficient to fund our

current projected cash requirements into the second half of 2023, we
will require additional financing in the future to fund our operations.

(*Id.* ¶ 47 (original emphasis omitted).) On the same day, BioLineRx also filed a Form 6-K with the

SEC, along with a press release stating in part: "[S]ubsequent to the end of the year, we

strengthened our balance sheet through a financing that resulted in gross proceeds of $34.5 million.

These funds will allow us to continue to execute on our strategy for [M]otixafortide . . . while in

parallel advancing our second clinical candidate, the anti-cancer immunotherapy AGI-134[.]" (*Id.*

¶ 46 (first alteration in original) (original emphasis omitted).)

Subsequently, in May 2021, BioLineRx announced the GENESIS study had "achieved all

of its primary and secondary endpoints with a high degree of statistical significance" and "[t]he

combination of Motixafortide and G-CSF was also found to be safe and well tolerated." (*Id.* ¶¶ 5,

32.) On May 26, 2021, Defendants told investors they believed they had sufficient resources to

fund its then-current projected cash requirements and various milestones into the first half of 2024.

(*Id.* ¶¶ 49–50.) For example, BioLineRx's Condensed Consolidated Interim Financial Statements,

attached as Exhibit 2 to BioLineRx's May 26, 2021 Form 6-K, states in part: "Management

believes that [BioLineRx's] current cash and other resources will be sufficient to fund its projected

cash requirements into the first half of 2024" but that "in the event that [BioLineRx] does not begin

to generate sustainable cash flows from its operating activities in the future, [it] will need to carry

out significant cost reductions or raise additional funding." (*Id.* ¶ 50 (original emphasis omitted).)

Likewise, BioLineRx's "Operating and Financial Review," attached as Exhibit 3 to the May 26,

2021 Form 6-K, states in part: "Developing drugs, conducting clinical trials and commercializing

products is expensive and we will need to raise substantial additional funds to achieve our strategic

objectives[,]" and "[a]lthough we believe our existing cash and other resources will be sufficient

to fund our current projected cash requirements into the first half of 2024, we will require

additional financing in the future to fund our operations." (*Id.* ¶ 51 (original emphasis omitted).) In the accompanying press release, Serlin stated "[W]e raised $34.5 million in January that we believe will finance the Company through multiple potentially value-creating milestones." (*Id.* ¶ 49 (original emphasis omitted).) BioLineRx made nearly identical statements—regarding BioLineRx being well-financed and Defendants' beliefs that they would have sufficient resources to achieve certain of BioLineRx's then-current projected goals but that although they believed this, BioLineRx would require additional financing in the future—in its August 18, 2021 and November 18, 2021 SEC filings and accompanying press releases. (*Id.* ¶¶ 53–59.)

A few months later, on March 16, 2022, BioLineRx filed another Form 6-K with the SEC, along with a press release, which states in part: "With over $57 million in cash, we believe we are well financed to extract maximum value from Motixafortide in SCM while at the same time advancing our other pipeline programs." (*Id.* ¶ 61 (original emphasis omitted).) On an earnings call held on the same day, Zeevi stated BioLineRx "held $57.1 million of cash, cash equivalents and short-term bank accounts as of December 31, 2021" and "We believe we are well financed to achieve multiple potentially value creating milestones." (*Id.* ¶ 63 (original emphasis omitted).) BioLineRx's Form 20-F filed with the SEC on March 16, 2022 similarly states in part:

> As of December 31, 2021, we held cash and short-term investments of $57.1 million. Based on our current projected cash requirements, we believe that our existing cash and investment balances and other sources of liquidity . . . will be sufficient to meet our capital requirements into the first half of 2024.
> ***
> Developing drugs, conducting clinical trials and commercializing products is expensive and we will need to raise substantial additional funds to achieve our strategic objectives. Although we believe our existing cash and other resources will be sufficient to fund our current projected cash requirements into the first half of 2024, we will require additional financing in the future to fund our operations. . . . However, in the event that [BioLineRx] does not begin to generate sustainable cash flows from its operating activities in the

> future, [BioLineRx] will need to carry out significant cost reductions
> or raise additional funding.

(*Id.* ¶ 60 (original emphasis omitted).) BioLineRx made similar statements—regarding

Defendants' belief that BioLineRx's "current cash and other resources would be sufficient to fund

its [then-current] projected cash requirements into the first half of 2024" and that although they

believed these resources would be sufficient into the first half of 2024, they would "require

additional financing in the future to fund [their] operations"—in both its May 11, 2022 and August

16, 2022 SEC filings and accompanying press releases. (*Id.* ¶¶ 65–76.)

On a BioLineRx earnings call held on August 16, 2022, Zeevi stated BioLineRx "held

$43.2 million of cash, cash equivalents and short-term bank deposits as of June 30, 2022" and "We

believe we are well financed to achieve multiple potentially value-creating milestones into the first

half of 2024." (*Id.* ¶ 75 (original emphasis omitted).) Serlin similarly stated on that same call: "as

far as the cash runway, we mentioned that we have $43 million in cash, which, again, as we

mentioned, is enough to take us through our major upcoming milestones . . . ." (*Id.* ¶ 75 (alteration

in original) (original emphasis omitted).) These upcoming milestones included potential U.S. Food

and Drug Administration ("FDA") approval and the U.S. launch of Motixafortide in SCM in 2023.

(*Id.*)

As late as September 1, 2022, BioLineRx "assured investors that it had a compelling

valuation and financial condition with sufficient cash until the first half of 2024 to execute its

strategy for Motixafortide in SCM, which included its commercial U.S. launch in 2023, while at

the same time advancing other pipeline programs." (*Id.* ¶ 77.) On September 12, 2022, BioLineRx

announced it submitted its New Drug Application ("NDA") to the FDA for Motixafortide in SCM

for autologous bone marrow transplantation for multiple myeloma patients. (*Id.* ¶ 34.) Shortly after

BioLineRx submitted its NDA to the FDA, on September 15, 2022, BioLineRx filed a Form 6-K

with the SEC, along with a press release, both of which disclosed that BioLineRx had entered in a $40 million non-dilutive loan agreement with Kreos Capital VII Aggregator SCSP ("Kreos Capital") and intended to use the funds from that agreement and available cash on-hand "to facilitate the commercial launch of Motixafortide in autologous stem cell mobilization for multiple myeloma patients, as well as for general corporate purposes." (*Id.* ¶¶ 79–80 (original emphasis omitted).) Serlin signed the loan agreement with Kreos Capital. (*Id.* ¶ 81.)

A few days later, on September 19, 2022, BioLineRx filed another Form 6-K with the SEC, along with a press release disclosing that BioLineRx had entered into agreements with certain institutional investors to issue and sell 13,636,365 of BioLineRx's ADS in a registered direct offering at a discount of nearly 30%,[2] to raise $15 million "to facilitate the commercial launch of Motixafortide in autologous stem cell mobilization for multiple myeloma patients and general corporate purposes, which may include working capital and funding clinical trials." (*Id.* ¶ 82 (original emphasis omitted).) Following this disclosure, BioLineRx's ADS share price fell approximately 34% on September 19, 2022. (*Id.* ¶¶ 11, 84.)

Plaintiffs allege Defendants' statements during the Class Period regarding their belief that BioLineRx had sufficient capital to meet its projected needs through the first half of 2024 were false and misleading because despite these representations, BioLineRx raised capital in September 2022 by entering into a $40 million loan agreement and selling certain ADS to certain institutional investors. (*See generally* ECF No. 29.) Specifically, Plaintiffs allege that during the Class Period, Defendants made a series of false and/or misleading statements, and/or failed to disclose, the following information in certain SEC filings and press releases: (1) BioLineRx "did not have

---

[2] Plaintiff alleges the direct offering purchase price of $1.10 per ADS was "a discount of almost 30% compared to the $1.54 closing price on Friday, September 16, 2022." (ECF No. 29 ¶ 83.)

enough funds to execute its strategy to develop Motixafortide in SCM, while at the same time advancing other pipeline programs, through the first half of 2024"; and (2) BioLineRx "would need significant additional funding by 2022 in order to fund its operations and pipeline programs." (*Id.* ¶¶ 46–78.[3]) According to Plaintiffs, these misrepresentations or omissions artificially inflated the price of BioLineRx's ADS, and they suffered damages when the price of BioLineRx's ADSs fell approximately 34% on September 19, 2022 following BioLineRx's disclosures about the Kreos Capital loan and direct securities offering. (*Id.* ¶¶ 9–11; *see also id.* ¶¶ 39–40, 79–84.) Plaintiffs also allege the Individual Defendants received copies of BioLineRx's SEC filings and press releases and therefore had the opportunity and ability to either prevent their issuance or correct them afterward as needed. (*Id.* ¶ 22.)

### B. Procedural History

On January 5, 2023, Plaintiffs filed a Class Action Complaint against Defendants for alleged violations of the federal securities laws. (ECF No. 1.) On July 5, 2023, in accordance with the Stipulation and Order regarding the time to file an amended complaint and motion to dismiss (ECF No. 28), Plaintiffs filed an Amended Class Action Complaint ("FAC") asserting the following two causes of action: (1) "Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder Against All Defendants" (Count I), and (2) "Violations of Section 20(a) of the Exchange Act Against the Individual Defendants" (Count II) (ECF No. 29). On September 5, 2023, Defendants filed a Motion to Dismiss the FAC pursuant to Federal Rules of Civil Procedure 8(a), 9(b), and 12(b)(6). (ECF No. 33.) On November 6, 2023, Plaintiffs filed an

---

[3] Plaintiffs group Defendants' alleged materially false and misleading statements into the following eight buckets: (1) the February 23, 2021 Statements; (2) the May 26, 2021 Statements; (3) the August 18, 2021 Statements; (4) the November 18, 2021 Statements; (5) the March 16, 2022 Statements; (6) the May 11, 2022 Statements; (7) the August 16, 2022 Statements; and (8) the September 1, 2022 Statements. (ECF No. 29 ¶¶ 46–78; *see also* ECF No. 37-2.)

Opposition (ECF No. 37), and on December 6, 2023, Defendants filed a Reply (ECF No. 38).

## II.   LEGAL STANDARD

### A.   Rule 12(b)(6)

In deciding a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6), a district court is "required to accept as true all factual allegations in the complaint and draw all inferences from the facts alleged in the light most favorable to [the non-moving party]." *Phillips*, 515 F.3d at 228. "[A] complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (citations omitted). However, "a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Id.* at 555 (alteration in original) (quoting *Papasan v. Allain*, 478 U.S. 265, 286 (1986)). A court is "not bound to accept as true a legal conclusion couched as a factual allegation." *Papasan*, 478 U.S. at 286. Instead, assuming the factual allegations in the complaint are true, those "[f]actual allegations must be enough to raise a right to relief above the speculative level[.]" *Twombly*, 550 U.S. at 555 (citations omitted).

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 570). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 678 (citing *Twombly*, 550 U.S. at 556). This "plausibility standard" requires the complaint to allege "more than a sheer possibility that a defendant has acted unlawfully," but it "is not akin to a 'probability requirement.'" *Id.* (citing *Twombly*, 550 U.S. at 556). "[D]etailed factual allegations" are not required, but "more than an

unadorned, the-defendant-unlawfully-harmed-me accusation" must be pleaded; it must include "factual enhancement" and not just conclusory statements or a recitation of the elements of a cause of action. *See id.* (citations omitted). In assessing plausibility, the court may not consider any "[f]actual claims and assertions raised by a defendant[.]" *Doe v. Princeton Univ.*, 30 F.4th 335, 345 (3d Cir. 2022).

"Determining whether a complaint states a plausible claim for relief [is] . . . a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679. "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.'" *Id.* (second alteration in original) (quoting Fed. R. Civ. P. 8(a)(2)). Indeed, after *Iqbal*, conclusory or "bare-bones" allegations will no longer survive a motion to dismiss: "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* at 678 (citing *Twombly*, 550 U.S. at 555). To prevent dismissal, all civil complaints must set out "sufficient factual matter" to show that the claim is facially plausible, "allow[ing] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556, 570). The Supreme Court's ruling in *Iqbal* emphasizes that plaintiffs must show that the allegations of their complaints are plausible. *See id.* at 670.

While courts generally may not consider anything beyond the four corners of the complaint on a motion to dismiss pursuant to Rule 12(b)(6), the Third Circuit has held that "a court may consider certain narrowly defined types of material without converting the motion to dismiss [to one for summary judgment pursuant to Rule 56]." *See In re Rockefeller Ctr. Props. Sec. Litig.*, 184 F.3d 280, 287 (3d Cir. 1999). Specifically, courts may consider any "document *integral to or*

*explicitly relied* upon in the complaint." *In re Burlington*, 114 F.3d at 1426 (quoting *Shaw*, 82 F.3d at 1220). However, "[w]hen the truth of facts in an 'integral' document are contested by the well-pleaded facts of a complaint, the facts in the complaint must prevail." *Princeton Univ.*, 30 F.4th at 342.

## B. Heightened Pleading Standard

"[F]aced with a Rule 12(b)(6) motion to dismiss a § 10(b) action, courts must, as with any motion to dismiss for failure to plead a claim on which relief can be granted, accept all factual allegations in the complaint as true." *Institutional Invs. Grp. v. Avaya, Inc.*, 564 F.3d 242, 252 (3d Cir. 2009) (alteration in original) (quoting *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 322 (2007)). Courts must also "consider the complaint in its entirety, as well as . . . documents incorporated into the complaint by reference, and matters of which a court may take judicial notice." *Id.* (quoting *Tellabs*, 551 U.S. at 322). However, because this is a securities fraud case, plaintiffs must satisfy the heightened pleading rules codified in the Private Securities Litigation Reform Act of 1995 ("PSLRA"). *Id.* The PSLRA replaced Federal Rule of Civil Procedure 9(b) ("Rule 9(b)") "as the applicable pleading standard in private securities class actions." *Rahman v. Kid Brands, Inc.*, 736 F.3d 237, 242 n.3 (3d Cir. 2013) (citing *Avaya*, 564 F.3d at 253). "Nonetheless, 'Rule 9(b)'s particularity requirement is comparable to and effectively subsumed by the requirements of [15 U.S.C. § 78u–4(b)(1) of] the PSLRA.'" *Id.* (alteration in original) (quoting *Avaya*, 564 F.3d at 253).

Pursuant to Rule 9(b), when alleging fraud, "a party must state with particularity the circumstances constituting fraud or mistake, although 'intent, knowledge, and other conditions of a person's mind may be alleged generally.'" *In re Lipitor Antitrust Litig.*, 868 F.3d 231, 249 (3d Cir. 2017) (quoting Fed. R. Civ. P. 9(b)); *see also United States ex rel. Moore & Co., P.A. v.*

*Majestic Blue Fisheries, LLC*, 812 F.3d 294, 307 (3d Cir. 2016) (holding that a "plaintiff alleging fraud must . . . support its allegations with all of the essential factual background that would accompany the first paragraph of any newspaper story—that is, the who, what, when, where and how of the events at issue" (citation omitted)). Accordingly, "a party must plead [its] claim with enough particularity to place defendants on notice of the 'precise misconduct with which they are charged.'" *United States ex rel. Petras v. Simparel, Inc.*, 857 F.3d 497, 502 (3d Cir. 2017) (citation omitted).

Likewise, "[u]nder the PSLRA's heightened pleading instructions, any private securities complaint alleging that the defendant made a false or misleading statement must: (1) 'specify each statement alleged to have been misleading [and] the reason or reasons why the statement is misleading'"; and (2) "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." *Tellabs*, 551 U.S. at 321 (alteration in original) (quoting 15 U.S.C. §§ 78u-4(b)(1), (b)(2)). Therefore, the PSLRA "requires that a complaint 'state with particularity both the facts constituting the alleged violation, and the facts evidencing scienter, i.e., the defendant's intention "to deceive, manipulate, or defraud."'" *Rahman*, 736 F.3d at 241–42 (quoting *Tellabs*, 551 U.S. at 313).

"To plead falsity, Rule 9(b) and the PSLRA each demand specificity." *Warren Police & Fire Ret. Sys. v. Prudential Fin., Inc.*, 70 F.4th 668, 680 (3d Cir. 2023). "Rule 9(b) requires that a fraud plaintiff "state with particularity the circumstances constituting fraud[,]" *i.e.*, "the time, place, and contents of the false representations or omissions, as well as the identity of the person making the statement and the basis for the statement's falsity." *Id.* "Like Rule 9(b), the PSLRA requires the pleadings to identify 'each statement alleged to have been misleading' and to specify 'the reason or reasons why the statement is misleading.'" *Id.* (quoting 15 U.S.C. § 78u-4(b)(1)).

"And if allegations of falsity are based on information and belief, instead of on 'evidentiary support,' the PSLRA requires the complaint to plead, with particularity, facts 'sufficient to support a reasonable belief as to the misleading nature of the statement or omission' before the allegations can be accepted as true." *Id.* (citations omitted). To satisfy this particularity requirement, the plaintiff must plead "facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2)(A). "A complaint will survive . . . only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Tellabs*, 551 U.S. at 324. "Upon a motion by any defendant, a claim for securities fraud under § 10(b) and Rule 10b-5 that lacks particularized allegations of falsity must be dismissed." *Warren Police*, 70 F.4th at 681.

"Although the pleading standards in Rule 9(b) and the PSLRA can be generally reconciled harmoniously for allegations of falsity, the PSLRA's requirements for allegations of *scienter* control over the more lenient standard in Rule 9(b) for mental-state allegations." *Id.* at 681 n.1 (citing *Avaya*, 564 F.3d at 253 ("The PSLRA's requirement for pleading scienter . . . marks a sharp break with Rule 9(b).")); *Tellabs*, 551 U.S. at 323–24); *compare* Fed. R. Civ. P. 9(b) (permitting "[m]alice, intent, knowledge, and other conditions of a person's mind [to] be alleged generally"), *with* 15 U.S.C. § 78u-4(b)(2)(A) (requiring a particularized statement of the "facts giving rise to a strong inference that the defendant acted with the required state of mind").

### C.  PSLRA Safe Harbor

The PSLRA's safe harbor provision "immunizes from liability any forward-looking statement, provided that: the statement is identified as such and accompanied by meaningful cautionary language; or is immaterial; or the plaintiff fails to show the statement was made with actual knowledge of its falsehood." *Avaya*, 564 F.3d at 254 (citing 15 U.S.C. § 78u-5(c)).

> The term "forward-looking statement" is broadly defined in the statute to include statements "containing a projection of revenues, income (including income loss), earnings (including earnings loss) per share, capital expenditures, dividends, capital structure, or other financial items"; statements of "the plans and objectives of management for future operations, including plans or objectives relating to the products or services of the issuer"; or statements of "future economic performance, including any such statement contained in a discussion and analysis of financial condition by the management or in the results of operations included pursuant to the rules and regulations of the Commission." 15 U.S.C. § 78u-5 (i)(1)(A)-(C). Further, forward-looking statements include "any statement of the assumptions underlying or relating to any statement described" in the definition. § 78u-5(i)(1)(D).

*Id.* at 255. Mixed present and future statements are entitled to the safe harbor only as to the portion of the statement that refers to the future. *Id.* (citations omitted). Additionally, to be protected under the PSLRA safe harbor, the forward-looking statements must be accompanied by "extensive and specific" cautionary language. *Id.* at 256 (quoting *GSC Partners CDO Fund v. Washington*, 368 F.3d 228, 243 n.3 (3d Cir. 2004)). "[A] vague or blanket (boilerplate) disclaimer which merely warns the reader that the investment has risks will ordinarily be inadequate to prevent misinformation. To suffice, the cautionary statements must be substantive and tailored to the specific future projections, estimates or opinions in the prospectus which the plaintiffs challenge." *Id.* (quoting *Semerenko v. Cendant Corp.*, 223 F.3d 165, 182 (3d Cir. 2000)).

## III.   DECISION

Defendants argue Plaintiffs' FAC should be dismissed for failure to state a claim. (*See generally* ECF No. 33-1.) Specifically, Defendants argue the FAC suffers three fatal deficiencies: (1) it fails to sufficiently allege any false or misleading statements; (2) even if the Court were to find the alleged statements were false or misleading, they are not actionable because they are forward-looking statements, not statements of a presently existing material fact, that were accompanied by sufficient cautionary language, and accordingly are protected by the PSLRA safe

harbor; and (3) even if the Court were to find the alleged statements were false and misleading and not protected by the PSLRA safe harbor, Plaintiffs fail to adequately plead scienter. (*Id.* at 1–3, 19–31; *see also* ECF No. 38.) Additionally, Defendants contend that because Plaintiffs' Section 10(b) and Rule 10b-5 claims fail as a matter of law, their Section 20(a) claim against the Individual Defendants must also be dismissed. (ECF No. 33-1 at 31.)

In opposition, Plaintiffs argue Defendants' Motion should be denied because (1) they adequately alleged materially false and misleading statements—namely, that Defendants lied to investors when they stated BioLineRx "had sufficient funds through the first half of 2024"; (2) Defendants' misstatements are not protected by the PSLRA safe harbor because they are not forward-looking but rather are statements or omissions of existing facts or circumstances, and they were not accompanied by meaningful cautionary statements; and (3) even if the Court were to find otherwise, they alleged sufficient facts suggesting a strong inference of scienter. (ECF No. 37.) Plaintiffs contend their allegations suggest a strong inference of scienter because (1) the Individual Defendants benefitted financially from the fraud as "[t]hey received a special bonus in 2022 for raising $15 million in capital that departed from an executive's typical annual compensation"; (2) Defendants knew in the summer of 2022 that BioLineRx would likely self-commercialize Motixafortide in SCM, and as such, knew self-commercialization was part of BioLineRx's plans when BioLineRx issued a press release on August 16, 2022 stating that it "[e]nded the quarter on solid footing and cash equivalents of $43.2 million, sufficient to fund operations as currently planned into the first half of 2024"; and (3) the timing of the alleged misstatements and disclosures suggest Defendants knew or should have known their statements were false and/or misleading. (*Id.* at 20–31 (alteration in original).)

The Court first addresses whether Plaintiffs have sufficiently alleged Section 10(b) and

Rule 10b-5 violations against the Defendants and then addresses whether Plaintiffs have sufficiently alleged a Section 20(a) violation against the Individual Defendants.

### A. Defendants' Motion to Dismiss Plaintiffs' Section 10(b) and 10b-5 Claims (Count I of the FAC)

Defendants argue Plaintiffs have failed to sufficiently allege a violation of Section 10(b) and Rule 10b-5 because they "failed to plead any actionable misrepresentations, let alone a strong inference that the Defendants acted with an intent to deceive." (ECF No. 33-1 at 19.) Defendants contend that the statements in their SEC filings and press releases—regarding their beliefs that BioLineRx's assets and cash resources would be sufficient to meet their projected needs at the time the statements were made—are not false and misleading, let alone *materially* false and misleading, and "the fact that [BioLineRx] raised capital does not render false or misleading its prior statements concerning its belief that its cash resources were sufficient to meet its projected needs." (*Id.* at 2, 22.) Defendants also submit Plaintiffs have not alleged "any misrepresentation of a presently existing material fact" and that even if the Court were to find otherwise, specific and tailored cautionary language accompanied each of the alleged misrepresentations. (*Id.* at 17, 23–26; *see also id.* at 13–17.) For example, Defendants assert BioLineRx "expressly disclosed the fact that it would need to raise additional capital." (*Id.* at 24.) Additionally, Defendants note "Plaintiffs' entire complaint rests on the unreasonable assumption that companies only raise capital when they have an immediate cash need" and "ignore the many other reasons why a company, particularly a pre-commercial-stage biopharmaceutical company with modest revenue, will raise capital when an opportunity presents itself, regardless of whether it has an immediate need for additional capital." (*Id.* at 1–2.)

Plaintiffs argue they have sufficiently alleged material misrepresentations or omissions because they alleged Defendants lied to investors about having sufficient funds through the first

half of 2024 when over a year earlier it disclosed that it would be raising capital by entering into a

loan of up to $40 million and by agreeing to sell its ADS to certain institutional investors in a direct

securities offering to raise $15 million. (ECF No. 37 at 1–2.) Plaintiffs state that despite Defendants

telling investors that BioLineRx "*currently* had sufficient cash on hand *through the first half of*

*2024*[,] . . . Defendants failed to disclose that [BioLineRx] actually did not have enough funds and

would need significant additional funding *in September 2022* in order to fund its operations and

pipeline programs." (*Id.* at 13–14.) Plaintiffs contend that based on Defendants' statements about

BioLineRx having sufficient funds through the first half of 2024, "most investors would have

believed that [BioLineRx] would not need additional financing for some reasonable period of time,

especially since its last equity financing had taken place during January 2021[.]" (*Id.* at 17.)

Plaintiffs assert Defendants should have disclosed they "did not have sufficient capital until the

first half of 2024 to achieve certain milestones." (*Id.* at 18.)

"The private right of action under Section 10(b) and Rule 10b–5 . . . creates liability for

false or misleading statements or omissions of material fact that affect trading on the secondary

market." *In re Burlington*, 114 F.3d at 1417. To state a claim for securities fraud pursuant to

Section 10(b) of the Exchange Act, "plaintiffs must allege (1) a material misrepresentation or

omission, (2) scienter, (3) a connection between the misrepresentation or omission and the

purchase or sale of a security, (4) reliance upon the misrepresentation or omission, (5) economic

loss, and (6) loss causation." *Edinburgh Council v. Pfizer, Inc.*, 754 F.3d 159, 167 (3d Cir. 2014)

(citations omitted). "To prevail on a § 10(b) claim, a plaintiff must show that the defendant made

a misleading statement or omission as to a material fact." *Howard v. Arconic Inc.*, 395 F. Supp. 3d

516, 537 (W.D. Pa. 2019) (citing *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 38 (2011)).

"For an omission or misstatement to be 'material,' it must be 'something that would alter the total

mix of relevant information for a reasonable investor making an investment decision.'" *Lovallo v. Pacira Pharms., Inc.*, Civ. A. No. 14-06172, 2015 WL 7300492, at *9 (D.N.J. Nov. 18, 2015) (quoting *In re Burlington*, 114 F.3d at 1425–26). Likewise, to state a claim for securities fraud under Rule 10b–5, a plaintiff "must 'allege defendants made a misstatement or an omission of material fact with scienter in connection with the purchase or the sale of a security upon which plaintiffs reasonably relied and plaintiff's [sic] reliance was the proximate cause of their injury.'" *Avaya*, 564 F.3d at 251 (quoting *Winer Family Tr. v. Queen*, 503 F.3d 319, 326 (3d Cir. 2007)). However, "Section 10(b) and Rule 10b–5 'do not create an affirmative duty to disclose any and all material information.'" *Edinburgh Council*, 754 F.3d at 174 (quoting *Matrixx Initiatives*, 563 U.S. at 44). "Disclosure is required . . . only when necessary 'to make . . . statements made, in the light of the circumstances under which they were made, not misleading.'" *Id.* (alterations in original) (quoting *Matrixx Initiatives*, 563 U.S. at 44). "Silence, absent a duty to disclose, is not misleading under Rule 10b–5." *Id.* (quoting *Basic Inc. v. Levinson*, 485 U.S. 224, 239 n.17 (1988)).

"[A] fact or omission is material only if 'there is a substantial likelihood that it would have been viewed by the reasonable investor as having significantly altered the "total mix" of information' available to the investor." *In re NAHC, Inc. Sec. Litig.*, 306 F.3d 1314, 1330 (3d Cir. 2002) (quoting *Levinson*, 485 U.S. at 231–32). For example, the Third Circuit in *Institutional Investors Group v. Avaya, Inc.* found that certain forecast-related statements a company made following "successful Q1 results" were not false or misleading because the facts alleged in the complaint supported the defendants' contention that "the projections were possible to achieve" at the time the statements were made. 564 F.3d at 266–67. The *Avaya* court also found these forecast-related statements—including the statements "Our first quarter results position us to meet our goals for the year"; and "we are on track to meet our goals for the year, even though there were some

aspects of our performance that are below our expectations and that we are working on to improve."—were forward-looking statements protected under the PSLRA safe harbor because "when read in context, [these statements] cannot meaningfully be distinguished from the future projection of which they are a part" and they were accompanied by sufficient cautionary language the court concluded was "extensive and specific" including explicit warnings that the company's "forward-looking statements '*may turn out to be wrong*' because '[t]hey can be affected by inaccurate assumptions we might make or by known or unknown risks and uncertainties.'" *Id.* at 246–47, 255–59 (last alteration in original).

However, the *Avaya* court found certain other statements were false and misleading— namely, the company CFO's statements made on multiple occasions in one month that "there were no significant changes to the pricing environment" and his statements initially denying, but later admitting, the company was providing discounts; whereas analyst reports during the same month "identified potential obstacles faced by [the company]," concluded "[the company] was experiencing 'weak' spending for its products and had fired sales staff in order to cut costs[,]" and was offering aggressive discounts for certain products. *Id.* at 248–49, 59–64.

Likewise, in *In re Stone & Webster, Inc. Securities Litigation*,[4] the court evaluated a company's statement that it had on hand "sufficient sources of funds to meet its anticipated [needs]" and concluded the part of that statement discussing the quantity of cash on hand was a false statement of present fact because plaintiffs alleged the company was lying about its then-current access to ample funds when in fact it was "in an extreme liquidity crunch" and later filed for bankruptcy. 414 F.3d 187, 212–13 (1st Cir. 2005) (alteration in original). The *Stone & Webster*

---

[4] Plaintiffs rely in part on this First Circuit case in support of their Opposition to Defendants' Motion. (*See* ECF No. 37 at 13–14.)

court noted plaintiffs' complaint portrayed defendant "as a company in financial distress, spiraling toward bankruptcy—out of cash, unable to keep up with payments, and with vendors and subcontractors halting work and deliveries and threatening liens." *Id.* at 210. The court further noted that plaintiffs' "claim was not that the [c]ompany was understating its future cash needs" but rather that "the [c]ompany had access to ample cash at a time when the [c]ompany was suffering a dire cash shortage." *Id.* at 213.

Conversely, the court in *Gissin v. Endres*[5] found a company's statement that "[b]ased on [its] current expectation of cash flows from operations and the cash and cash equivalent short-term investments, and also our revolving credit facility, we feel we will be in a position to fund those capital investments for the year" did "not justify the financial projections in terms of any particular aspect of the company's current situation" but rather merely presented "an assertion [that] is necessarily implicit in every future projection." 739 F. Supp. 2d 488, 505–06 (S.D.N.Y. 2010) (last alteration in original). The *Gissin* court explained that in making this statement, which was made on an earnings conference call, "[d]efendants were not making guarantees about the present" but rather "were stating their educated guess about what the preceding quarter's financial data would mean for the [c]ompany's future." *Id.* at 506. *See also Key Equity Invs., Inc. v. Sel-Leb Mktg. Inc.*, 246 F. App'x 780, 785 (3d Cir. 2007) (concluding the complaint "fail[ed] to satisfy the heightened pleading requirements of Rule 9(b) and the PSLRA" because, among other things, "almost all the statements identified by [plaintiff] were projections about the company's financial growth, or expressions of general optimism about its financial health"; the court stated "[s]uch positive portrayals of the company [] are not actionable under § 10(b)" and affirmed the district court's dismissal of the complaint); *Lewakowski v. Aquestive Therapeutics, Inc.*, Civ. A. No. 21-03751,

---

[5] Defendants rely on this S.D.N.Y. case in support of its Motion. (*See* ECF No. 38 at 6–8.)

2023 WL 2496504, at *9 (D.N.J. Mar. 14, 2023) (finding statements beginning with "We believe . . ." and "I think . . ." regarding future prospects of FDA approval fell under the PSLRA safe harbor because the statements were forward-looking and "accompanied by specific warnings that disclosed specific risks" and the plaintiffs did not allege any facts showing defendants "actually knew their optimistic statements about FDA approval were false when made").

Here, the Court finds the FAC fails to satisfy the heightened pleading requirements of Rule 9(b) and the PSLRA because, even accepting the FAC's factual allegations as true, it does not sufficiently allege a material misrepresentation or omission by Defendants. Plaintiffs' claim is essentially that Defendants misled investors to believe BioLineRx had sufficient funds through the first half of 2024 to achieve various milestones when it must not have had sufficient funds because it disclosed in September 2022, over a year earlier, that it would be raising additional capital through a loan and a direct securities offering. However, the FAC does not allege sufficient facts showing how Defendants' statements about having sufficient funds through the first half of 2024 were false. Rather, Plaintiffs seem to rely on the implied assumption that Defendants would not have raised capital in September 2022 unless they had insufficient funds to last them into 2024, and because Defendants raised capital in September 2022, they must have lied about having enough cash on hand to last them into 2024. In other words, Plaintiffs' allegations hinge on the implied assumption that a company would not raise capital unless it was in dire or immediate need of money, and as Defendants note, "[t]aken to its logical extreme, Plaintiffs' position would require [BioLineRx] to wait to the end of its cash runway before it could raise additional capital for future operations." (ECF No. 33-1 at 2 n.1.) But an implied assumption without adequate supporting underlying facts is insufficient to satisfy the heightened pleading standards for a case alleging violations of Section 10(b) and Rule 10b-5. The FAC does not adequately allege facts showing

BioLineRx did not have the amount of funds it stated it had at the time Defendants' statements were made or that those funds were not sufficient to last into 2024, irrespective of the additional capital obtained in September 2022.

Unlike the plaintiffs in *Stone & Webster*, Plaintiffs here do not allege that Defendants made false statements about current capital despite being "in an extreme liquidity crunch" and "suffering a dire cash shortage," nor do Plaintiffs allege Defendants were or are on the verge of bankruptcy or that they misstated the specific amount of cash they had on hand at the time those statements were made. *See In re Stone & Webster*, 414 F.3d at 212–13. Rather, Plaintiffs claim is Defendants' statements about BioLineRx having sufficient funds through the first half of 2024 were false because BioLineRx raised additional capital over a year earlier, in September 2022. Defendants' statements about their belief that they had sufficient funds to last through the first half of 2024 are more akin to the forecast-related statements in *Avaya* and the statements about current cash flows and financial projections in *Gissin* that were found not to be false and misleading and/or were found to be covered as forward-looking statements under the PSLRA safe harbor. *See Avaya*, 564 F.3d at 266; *Gissin*, 739 F. Supp. 2d at 505–06. To the extent Plaintiffs intended to allege otherwise, that is not clear from the facts in the FAC as pled.

Even assuming for the purpose of this Opinion that Defendants' statements as alleged in the FAC were false and misleading, statements about Defendants' *beliefs* that BioLineRx had sufficient capital through the first half of 2024 to achieve certain future goals would likely fall under the PSLRA safe harbor as forward-looking statements—made in connection with BioLineRx's then-current estimates and projections of its future needs and goals—that were accompanied by sufficient cautionary statements. For example, BioLineRx's Form 20-F filed with the SEC on February 23, 2021 states in part: "We cannot assure investors that our existing cash

and investment balances will be sufficient to meet our future capital requirements" and "Although we believe our existing cash and other resources will be sufficient to fund our current projected cash requirements into the second half of 2023, we will require additional financing in the future to fund our operations"; similarly, BioLineRx's Form 20-F filed with the SEC on March 16, 2022 states in part: "[W]e will need to raise substantial additional funds to achieve our strategic objectives" and "Although we believe our existing cash and other resources will be sufficient to fund our current *projected* cash requirements into the first half of 2024, we will require additional financing in the future to fund our operations." (ECF No. 29 ¶¶ 47, 60 (original emphasis omitted).) The March 16, 2022 Form 20-F further states: "Management believes that [BioLineRx's] current cash and other resources will be sufficient to fund its projected cash requirements into the first half of 2024" but "in the event that [BioLineRx] does not begin to generate sustainable cash flows from its operating activities in the future, [BioLineRx] will need to carry out significant cost reductions or raise additional funding." (*Id.* (original emphasis omitted).) BioLineRx's filings with the SEC on May 26, 2021, August 18, 2021, November 18, 2021, May 11, 2022, and August 16, 2022 contained similar, if not identical, statements. (*See id.* ¶¶ 46–76.) When considering the FAC and incorporated documents in their entirety and reading Defendants' statements in context, their statements about their *beliefs* regarding BioLineRx's then-current cash position were forward-looking statements based on available information at the time those statements were made. Additionally, these statements were accompanied by tailored cautionary statements explicitly stating BioLineRx would in the future "need to raise substantial additional funds," would "require additional financing," and would "need to carry out significant cost reductions or raise additional funding."[6] Accordingly, the Court finds Plaintiffs have failed to sufficiently state a claim under §

---

[6] Defendants also note in their Motion that while BioLineRx "has engaged in several significant

10(b) or Rule 10b-5 because they do not adequately allege materially false or misleading statements, and even if Defendants' alleged statements were false and misleading, absent additional facts not currently alleged in the FAC, they would likely be covered as forward-looking statements under the PSLRA safe harbor and therefore would not be actionable.

Therefore, Defendants' Motion to Dismiss Count I of the Amended Complaint is **GRANTED**. Because the Court finds the FAC does not sufficiently allege with particularity misstatements or omissions of material facts made by Defendants, it concludes that further analysis of the complaint is unnecessary at this time. *See Osio v. DeMane*, Civ. A. No. 05-02283, 2006 WL 2129460, at *12 (D.N.J. June 20, 2006) (noting "the Court need not address the remaining elements of a claim under § 10(b) or Rule 10b-5" because plaintiffs did not sufficiently plead an omission of material fact).

### B. Defendants' Motion to Dismiss Plaintiffs' Section 20(a) Claim Against the Individual Defendants (Count II of the FAC)

Section 20(a) provides:

> Every person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable . . . unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action.

15 U.S.C. § 78t(a). Liability under Section 20(a) "is derivative of an underlying violation of Section 10(b) by the controlled person." *Rahman*, 736 F.3d at 247 (quoting *Avaya*, 564 F.3d at

---

rounds of financing, it regularly looks at potential financing options to ensure that it will have sufficient capital to continue its research, development, and commercialization efforts"; and indeed, BioLineRx disclosed in each of its SEC filings that it "has an agreement in place with a placement agent – H.C. Wainwright & Co., LLC – that allows [BioLineRx], in its sole discretion, to sell up to $25 million of additional securities into the market." (ECF No. 33-1 at 6.)

252). "Thus, for a controlling person to be liable, the person over whom control was exercised must have committed a primary violation of the securities laws." *In re Intelligroup Sec. Litig.*, 527 F. Supp. 2d 262, 280 (D.N.J. 2007) (citations omitted).

Here, because the Court found the FAC fails to state a claim under Section 10(b), and liability under Section 20(a) is derivative of an underlying Section 10(b) violation, the Court finds the FAC also fails to state a claim under Section 20(a) against the Individual Defendants. *See Biondolillo v. Roche Holding AG*, Civ. A. No. 17-04056, 2019 WL 1468140, at *4 (D.N.J. Apr. 3, 2019) ("Because the Second Amended Complaint fails to state a claim under Section 10(b), it also fails to state a claim under Sections 20(a) and 20A.").

Therefore, Defendants' Motion to Dismiss Count II of the Amended Complaint is **GRANTED**.

### C.  Leave to Amend

Defendants request Plaintiffs' FAC be dismissed with prejudice. (ECF No. 33-1 at 3, 32.) Plaintiffs, however, request leave to amend any pleading deficiencies. (ECF No. 37 at 32 n.21.) The Federal Rules of Civil Procedure generally require the Court to "freely give leave [to amend] when justice so requires." Fed. R. Civ. P. 15. "In the Third Circuit, plaintiffs whose complaints fail to state a cause of action are entitled to amend their complaint unless doing so would be inequitable or futile." *Lovallo*, 2015 WL 7300492, at *14 (citing *Fletcher-Harlee Corp. v. Pote Concrete Contractors, Inc.*, 482 F.3d 247, 252 (3d Cir. 2007)).

Here, allowing Plaintiffs to amend would not be futile as they could provide additional factual content to attempt to cure the deficiencies in the FAC. *See Munenzon v. Peter Advisors, LLC*, 553 F. Supp. 3d 187, 210 (D.N.J. 2021); *see also United States ex rel. Petratos v. Genentech, Inc.*, Civ. A. No. 11-03691, 2014 WL 7331945, at *2 (D.N.J. Dec. 18, 2014) (stating that "within

the Third Circuit, even when a complaint is vulnerable to Rule 12(b)(6) dismissal, the district court should allow the party a curative amendment, unless the amendment would be futile or inequitable").

Therefore, the Court denies Defendants' request to dismiss the FAC with prejudice and grants Plaintiffs leave to file a second amended complaint.

## IV.   CONCLUSION

For the reasons set forth above, Defendants' Motion to Dismiss (ECF No. 33) is **GRANTED**, and Plaintiffs' FAC (ECF No. 29) is **DISMISSED WITHOUT PREJUDICE**. An appropriate Order follows.


*/s/ Brian R. Martinotti*
**HON. BRIAN R. MARTINOTTI**
**UNITED STATES DISTRICT JUDGE**

Dated:  July 15, 2024